Hillsborough
No. 92-243

JOEL CHADWICK d/b/a THE GREAT AMERICAN FLOOR COMPANY

v.

CSI, LTD. AND PINE HILL WALDORF SCHOOL

PINE HILL WALDORF SCHOOL

v.

JOEL CHADWICK d/b/a THE GREAT AMERICAN FLOOR COMPANY
AND CSI, LTD.

CSI, LTD.

v.

PINE HILL WALDORF SCHOOL

August 5, 1993

*Wiggin & Nourie, P.A.*, of Manchester (*Richard B. McNamara* and *Mary Anne Mueller* on the brief, and *Mr. McNamara* orally), for Joel Chadwick d/b/a The Great American Floor Company.

*Sulloway & Hollis*, of Concord (*Michael M. Lonergan* and *W. Kirk Abbott, Jr.* on the brief, and *Mr. Lonergan* orally), for CSI, Ltd.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Joseph M. McDonough, III* and *Eileen Fox* on the brief, and *Mr. McDonough* orally), and *Wadleigh, Starr, Peters, Dunn & Chiesa*, of Manchester (*Eugene M. Van Loan, III* on the brief), for Pine Hill Waldorf School.

BROCK, C.J. Pine Hill Waldorf School (Pine Hill) brings this interlocutory appeal after the first part of a bifurcated proceeding in the Superior Court (*Dalianis*, J.). The issues before the superior court were whether Pine Hill and CSI, Ltd. (CSI) intended to enter into a construction contract containing provisions waiving certain subrogation rights of the parties, and, if so, what the appropriate scope of those waivers should be. On appeal Pine Hill argues that the trial court erred by failing to order a mistrial during the proceedings before the jury, by presenting a misleading question to the jury in a special verdict form, and by misconstruing the validity and scope of the contractual waivers of subrogation. We affirm.

In the spring of 1988, Pine Hill entered into a construction contract with CSI, a general contractor, to finish the interior of the auditorium in the Pine Hill Waldorf School in Wilton. CSI then subcontracted with Joel Chadwick, doing business as The Great American Floor Company, to install hardwood floors in the auditorium. In October 1988, before the project was completed, the auditorium was destroyed by fire and adjoining parts of the school were damaged.

Chadwick initiated legal action against Pine Hill and CSI for failure to pay for materials and services provided under Chadwick's subcontract. Pine Hill filed a counterclaim against Chadwick alleging that Chadwick's negligence caused the fire. Pine Hill also filed a cross-claim against CSI alleging vicarious liability and negligent supervision of its subcontractor. The trial court bifurcated the litigation, separating the contractual issues from those involving liability for the fire and a determination of damages.

It is undisputed that Pine Hill and CSI entered into a contract to finish the interior of the auditorium at the Pine Hill Waldorf School. Mark D. Birdsall, as the president of Pine Hill's board of trustees, and Thomas G. Brown, as vice president of CSI, signed a standard document created and endorsed by the American Institute of Architects (AIA) entitled "Standard Form of Agreement Between Owner and Contractor." This standard form agreement expressly incorporates by reference another AIA document entitled "General Conditions of the Contract for Construction."

Article 11 of the General Conditions establishes what kinds of insurance must be purchased under the contract, which parties are responsible for purchasing the insurance, and which parties bear the risk for certain losses such as property damage and personal injury. Article 11 also provides for a waiver of subrogation whereby the owner and contractor waive all rights against each other and their

subcontractors for damages caused by fire to the extent that those damages are covered by property insurance obtained pursuant to the provisions of article 11.

The basic question before the jury was whether Pine Hill and CSI intended to enter into a standard construction contract containing the waiver of subrogation provisions. There was evidence that Pine Hill and CSI had agreed to enter into the standard AIA contract, which expressly incorporated the General Conditions containing the waiver provisions. Pine Hill, however, presented evidence in support of its allegations of mutual mistake that neither Pine Hill nor CSI intended for Pine Hill to waive its subrogation rights as part of the contract. Pine Hill contended that its representatives were never presented with and never read a copy of the General Conditions. Pine Hill also presented testimony that on several occasions during their relationship, CSI's agents had represented that CSI would be liable for damages caused by fire. The jury found in favor of CSI and Chadwick. The trial court then interpreted the waiver of subrogation provisions in the AIA contract as precluding Pine Hill from pursuing its claims to recover damages to the extent the damage caused by the fire was covered by Pine Hill's own insurance. Pine Hill then filed this interlocutory appeal.

Pine Hill first argues on appeal that the trial court erred by denying Pine Hill's motion for a mistrial. During his opening statement, counsel for CSI explained to the jury that Pine Hill's insurance carrier, Commercial Union Insurance Company (Commercial Union), had already paid Pine Hill for its insured fire losses, and that this case arose because Commercial Union is interested in recovering its money from CSI and Chadwick through subrogation. Pine Hill argues that these statements before the jury were improper and deliberately misleading. It contends that Commercial Union is not a party to the case, and to insinuate that they are the actual party in interest implies incorrectly that Pine Hill has been fully compensated for its losses and serves to prejudice the jury against Pine Hill. Pine Hill argues that this prejudice is grounds for a mistrial.

■■ "It is within the discretion of a trial court to declare a mistrial if some circumstance exists which indicates that justice may not be done if the trial continues to a verdict." *Panas v. Harakis & K-Mart Corp.*, 129 N.H. 591, 615, 529 A.2d 976, 990 (1987) (quotation and brackets omitted). If, however, the error can be effectively remedied, no mistrial will be declared. *Id.* We will not reverse a trial court's decision on whether to grant a mistrial absent an abuse of discretion. *State v. Ellison*, 135 N.H. 1, 4, 599 A.2d 477, 480 (1991).

■ The trial court did not abuse its discretion in denying Pine Hill's motion for a mistrial. Given the nature of this case, the trial court could reasonably find that the statements made during CSI's opening did not unduly prejudice the jury. The main issue before the jury was whether Pine Hill and CSI intended to enter into a contract in which Pine Hill waived certain subrogation rights against CSI. This case necessarily involved the discussion and explanation of contract language relating to subrogation, and whether and to what extent the parties sought to insure their interests. It was certainly relevant for CSI to explain to the jury that Commercial Union had paid for Pine Hill's insured fire losses. Direct evidence of the type and extent of Pine Hill's insurance explains why the subrogation rights of the parties are even at issue and is evidence of Pine Hill's intent upon entering into the contract. It is also difficult to identify any particular prejudicial effect that CSI's opening statements could have had when, during the course of the trial, Pine Hill introduced the full text of its own insurance policy with Commercial Union. In addition, Pine Hill's own expert testified that this policy insured Pine Hill for fire loss. Finally, if CSI's statements could be seen as an attempt to prejudice the jury, any such prejudice was properly cured by the judge's instruction directing the jury to afford insurance companies the same consideration as any other party.

Pine Hill next argues that the trial court erred by presenting a misleading and confusing question to the jury in the court's special verdict form. At the end of the trial, the court directed the jury, as part of its charge, to answer the question posed in the special verdict form. The parties had submitted proposed special verdict questions, but the trial court presented its own, which asked: "Did the parties intend to enter into a standard AIA contract?" Pine Hill contends that there was no dispute that the parties intended to enter into a standard contract. Rather, the essential issue to be decided was whether the parties intended the General Conditions containing the subrogation waivers to be part of the standard construction contract. As evidence of the confusion purportedly created by the language of the special verdict question, Pine Hill cites to the jury's query to the judge during deliberations:

"Judge -

Page one of the instructions, second sentence, states ' . . . the parties intend to be bound by all of the terms of the contract they signed.'

The question we have been asked to answer is:

'Did the parties intend to enter into a standard AIA contract?'

We feel there may be a difference between the two. Help!"

The trial court replied with the following supplemental instruction: "Mr. Bushey: Answer the verdict question. Disregard the instruction language to the extent you may think it inconsistent." Pine Hill contends that the trial court's supplemental instruction further compounded the problems with the special verdict question.

CSI argues that the issues raised with respect to the special verdict form were not properly preserved by Pine Hill for appeal. Pine Hill did not object to the special verdict question given to the jury or to the trial court's supplemental instruction. Pine Hill argues that the issues were preserved by a blanket exception given by the trial court and by the fact that Pine Hill had submitted its own proposed special verdict question to the court. The blanket exception cited by Pine Hill refers to statements of the trial court made in chambers:

"As to the jury instruction, the court has given specific requests that various parties probably object to and has failed to give specific requests that various other parties probably object to. Written instructions have been provided. Everyone has an exception to any specific inclusion or omission, and any party may now take the opportunity to amplify the record concerning this issue."

Pursuant to an inquiry by one of the parties, the trial court confirmed that the blanket exception applied only to the trial court's failure to give certain of the individual instructions requested by the parties and not to the written instructions actually given to the jury.

■■ We will not review an issue on appeal that has not been raised before the trial court by a timely objection. *See State v. Niquette*, 122 N.H. 870, 873, 451 A.2d 1292, 1294 (1982). "This rule is particularly appropriate when alleged errors in jury instructions are involved." *Id.* "The process of stating objections to the charge is not a mere predicate for a later appeal; the object is to advise the trial judge of a claim of error that can be addressed before any damage is beyond correction in the trial court." *Daigle v. City of Portsmouth*, 129 N.H. 561, 583, 534 A.2d 689, 701 (1987).

■■ We hold that Pine Hill's claim regarding the special verdict form is not preserved for appeal. The blanket exception given by the trial court applied only to the trial court's failure to give the individual instructions requested by the parties. Once a trial court has read

and rejected the jury instructions requested by a party, a blanket exception may be an effective way of registering that party's objection to the trial court's failure to give those instructions. *See State v. Pinardville Athletic Club*, 134 N.H. 462, 465, 594 A.2d 1284, 1286 (1991) (the reasons for objecting to a trial court's failure to give a requested instruction are known to the court once it has read and rejected the instruction). The issues Pine Hill raises on appeal, however, allege error in the wording of the special verdict question actually given by the trial court as part of its instructions. The blanket exception did not, and could not, properly pertain to objections that the parties may have had with the question actually given. The trial court's reading of Pine Hill's proposed question does not identify any potential problems with the question given by the trial court, nor does it even indicate that Pine Hill found the trial court's version of the question objectionable. Because Pine Hill did not object to the trial court's special verdict question or supplemental instruction, the issues are not preserved for appeal.

Even assuming that Pine Hill was misled as to the scope of the trial court's blanket exception, and that this issue is preserved for appeal, we nevertheless find Pine Hill's claim to be meritless. We cannot say that the question posed to the jury in the special verdict form was confusing or misleading in light of the jury instructions and the evidence presented at trial. The trial court's reference to "a standard AIA contract" clearly refers to a contract comprised of the AIA Standard Form of Agreement as well as the entire body of AIA General Conditions that contains the subrogation waivers in question. The jury instructions properly phrase the issue, directing the jury that

> "[i]f you find that the General Conditions of the Contract and, more specifically, that Pine Hill's waiver of its rights to sue CSI for any damages caused by CSI to the extent covered by insurance, failed to express the intention which the parties had in making the contract, you must find that the general conditions of the contract do not constitute terms of the agreement between the parties."

The General Conditions are explicitly incorporated in the Standard Form by reference throughout the document. If the jury believed that the parties had not intended to waive their subrogation rights, then the jury would have decided that the parties did not enter into a standard AIA contract. We do not believe that the trial court's supplementary instruction directing the jury to disregard certain incon-

sistent instruction language served to confuse the jury in its task. The jury questioned the consistency of only one instruction and was directed to disregard the perceived inconsistency in only that instruction, leaving the remainder of the jury charge intact. In conclusion, we note that the single issue before the jury in this four-day trial was whether the parties had intended to agree to the standard AIA contract terms waiving certain rights of subrogation. Although the special verdict form did not reflect the intricacies involved in the arguments of the parties, we find it difficult to believe that the language of the special verdict question somehow led the jury away from rendering a decision on the true dispute in the case.

Thirdly, Pine Hill argues that the trial court erred in ruling that the waiver of subrogation provisions in the General Conditions of the contract were enforceable against Pine Hill. Pine Hill asserts that these waivers are exculpatory provisions, and therefore are generally prohibited under New Hampshire law. *See Barnes v. N.H. Karting Assoc.*, 128 N.H. 102, 106, 509 A.2d 151, 154 (1986). Pine Hill argues that these exculpatory provisions are unenforceable because they were not knowingly agreed to by Pine Hill, do not expressly disclaim negligence, and are unconscionable.

The contract provisions at issue are as follows:

"11.3.3 Loss of Use Insurance. The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Contractor for loss of use of the Owner's property, including consequential losses due to fire or other hazards however caused."

"11.3.5 If during the Project construction period the Owner insures properties, real or personal or both, adjoining or adjacent to the site by property insurance under policies separate from those insuring the Project . . . the Owner shall waive all rights in accordance with the terms of Subparagraph 11.3.7 for damages caused by fire or other perils covered by this separate property insurance."

"11.3.7 Waivers of Subrogation. The Owner and Contractor waive all rights against . . . each other and any of their subcontractors . . . for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 11.3 or other property insurance applicable to the Work . . . ."

■ We disagree with Pine Hill's characterization of these contract terms as straight exculpatory provisions. They exist in the contract as part of a larger comprehensive approach to indemnifying the parties involved in the construction project, allocating the risks involved, and spreading the costs of different types of insurance. These paragraphs do not present the same concerns as naked exculpatory provisions. As opposed to the exculpatory provisions recognized by this court in other cases, *see, e.g., Barnes*, 128 N.H. at 104–05, 509 A.2d at 152–53; *Tanguay v. Marston*, 127 N.H. 572, 577, 503 A.2d 834, 837 (1986), the insurance provisions of the standard AIA contract are not designed to unilaterally relieve one party from the effects of its future negligence, thereby foreclosing another party's avenue of recovery. Instead, they work to ensure that injuries or damage incurred during the construction project are covered by the appropriate types and limits of insurance, and that the costs of that coverage are appropriately allocated among the parties. For example, while Pine Hill may bear the risk for any loss of use of its property or for fire damage to its insured property, CSI, as general contractor under the standard AIA contract, bears the risk against workers' compensation claims and personal injuries arising, at least in some part, out of the contractor's operations. Not only have we acknowledged that this contractual approach to allocating insurance burdens is not contrary to public policy, we have acknowledged that it is of particular value to those involved in the construction industry. *See Commercial Union Assurance Co. v. Brown Co.*, 120 N.H. 620, 625, 419 A.2d 1111, 1114 (1980). In light of the jury's finding that the parties intended to enter into a standard AIA contract, we hold that the trial court did not err in enforcing the particular waiver provisions contained therein.

■ Lastly, Pine Hill argues that the trial court incorrectly applied the waiver provisions in the General Conditions to the damages incurred by Pine Hill beyond those sustained to "the Work," as that term is defined under the contract. The contract states:

"The term 'Work' means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor . . . ."

The trial court relied upon paragraphs 11.3.5 and 11.3.7, which deal with waivers of subrogation and which are quoted above, in ruling that Pine Hill waived its rights to recover for damage to property

adjacent to the site to the extent that such adjacent property was covered by Pine Hill's own insurance. We agree with the trial court's ruling.

Pine Hill argues that paragraph 11.3.5 cannot be interpreted as a waiver of its subrogation rights when read in light of other contract provisions requiring the contractor, CSI, to indemnify Pine Hill for certain property losses and against "claims for damages, other than to the Work itself, because of injury to or destruction of tangible property." Pine Hill contends that if paragraph 11.3.5 was intended to waive Pine Hill's claims for damages to property other than the Work, then the paragraphs requiring CSI to buy liability coverage and indemnify Pine Hill against such losses would be unnecessary. Paragraph 11.3.7, however, reconciles any inconsistency among these provisions by expressly stating that "[a] waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise." We reject Pine Hill's argument on the ground that this provision establishes that the waiver of subrogation in paragraph 11.3.5 is effective even if CSI is required to indemnify and insure Pine Hill for damage to property other than the Work.

Pine Hill also argues that paragraph 11.3.5 is inapplicable in this case because Pine Hill did not insure the adjoining or adjacent properties under a policy "separate" from that insuring the Work. Instead, Pine Hill insured the Work by raising the limits on its pre-existing property insurance. In interpreting the terms of a contract, we look to the contract as a whole and consider all of its provisions. *See Commercial Union Assurance Co.*, 120 N.H. at 623, 419 A.2d at 1113. The language of paragraph 11.3.5 that refers to separate policies must be read in conjunction with paragraph 11.3.1, which requires Pine Hill to purchase property insurance for the Work at the outset of the project. This insurance was intended to protect the "interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Work." Paragraph 11.3.1, therefore, contemplates the Work being insured under a policy separate from any other insurance maintained by the Owner solely for the Owner's benefit. In light of the intended scheme of purchasing insurance for the Work, the reference to separate policies must be interpreted as referring to property insurance maintained by Pine Hill other than that purchased to insure the Work. We do not believe that the language referring to separate policies has any independent significance beyond achieving consistency among the paragraphs allocating the risks and burdens of insurance under the contract, and we will not abrogate

Pine Hill's contractual waiver of subrogation simply because Pine Hill failed to comply with the precise language of the contract in its purchase of insurance for the Work.

Pine Hill further argues that paragraph 11.3.5 is ambiguous to the extent it refers to properties adjoining or adjacent to the "site." Pine Hill contends that the word "site" could be construed to mean the area where the Work is taking place or to mean the entire parcel of property on which the building under construction is located. Under the latter interpretation, paragraph 11.3.5 would not apply to the damage to the parts of the Pine Hill Waldorf School adjacent to the auditorium because these parts of the school and the auditorium are on the same parcel of land.

 As noted above, we interpret the terms of a contract by considering the contract as a whole, *see Commercial Union Assurance Co.*, 120 N.H. at 623, 419 A.2d at 1113, and will give its terms their reasonable meaning, *see Kilroe v. Troast*, 117 N.H. 598, 601, 376 A.2d 131, 133 (1977). In light of the contract's language and overall structure, we do not find the term "site" to be ambiguous. We interpret the word "site" as referring to the place where the Work is taking place, regardless of whether that place constitutes an entire parcel of property or just a portion thereof. The structure of the contract relies upon the distinction between what is included in the Work and what is separate from the Work. To interpret the word "site" as distinguishing between parcels of land is nonsensical within the framework of the contract. Such a distinction between parcels of land as opposed to Work and non-Work areas also has no functional basis in the overall contractual scheme for obtaining insurance and allocating risks. We conclude that the trial court did not err in applying the waiver of subrogation provisions to the damages incurred by Pine Hill beyond those sustained by the Work.

*Affirmed.*

All concurred.