Rodriguez v. Northern Telecom, Inc.   CV-93-259-SD  06/15/95

UNITED STATES DISTRICT COURT FOR THE

                       DISTRICT OF NEW HAMPSHIRE


Franklyn Rodriguez;
Marilda Rodriguez


     v.                                    Civil No. 93-259-SD


Northern Telecom, Inc., et al


                          O R D E R


     Plaintiffs Franklyn and Marilda Rodriguez bring this
diversity action against defendants Northern Telecom, Inc.
(Northern); Mehlhorn Construction Company; Twigg Associates,
Inc.; and John Doe alleging claims of negligence regarding a
workplace accident in which Franklyn Rodriguez purportedly
tripped over a metal anchor bolt protruding from a concrete
floor.

     Northern subsequently filed a third-party indemnification
action against The Scott Lawson Group Limited, d/b/a Applied
Occupational Health Systems (AOHS), the firm hired to supervise
an asbestos abatement project for one of Northern's buildings,
and International Environmental Services, Inc., d/b/a
Environmental U.S.A. (IES), the firm hired by Northern to

actually effect the asbestos removal.[1]

Presently before the court is Northern's motion for summary judgment regarding indemnification, to which AOHS objects.[2]

### Factual Background

On May 23, 1990, Northern and AOHS entered into a "Services Agreement" wherein AOHS agreed to perform specified management services associated with the removal and remediation of asbestos from Northern's facility located at 99 Airport Road in Concord, New Hampshire (the site).[3] Incorporated into said document is an indemnity clause, which provides,

> Contractor [AOHS] shall indemnify and hold NTI [Northern] harmless from any and all loss, damages and costs (including attorneys' fees) and from all claims for injury or death to persons or loss of or injury to property, caused by the fault or negligence of Contractor, its employees and agents, and in any way connected with or arising out of this Agreement or the services or work performed hereunder. This indemnity shall survive the termination or expiration of this Agreement.

---

[1]Franklyn Rodriguez was, at the time of the injury, employed by IES.

[2]The court notes that IES failed to respond to the third-party complaint, and a default judgment has accordingly been entered.

[3]The actual removal of asbestos material was to be performed by IES under a separate contract executed between IES and Northern.

May 23, 1990, Services Agreement ¶ 10 (attached to AOHS's Objection).

On or about May 28, 1990, another contractor at the site, Mehlhorn Construction Company, removed an interior fence which delineated space within the building, thus exposing metal anchor bolts that protruded from the concrete floor. At some point subsequent to this removal, plaintiff allegedly tripped over the unmarked bolts and suffered, among others, severe back injuries.

## Discussion

### 1. Summary Judgment Standard

Summary judgment shall be ordered when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "'is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Stone & Michaud Ins., Inc. v. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Although "motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some

3

day reveal," <u>Maldonado-Denis v. Castillo-Rodriguez</u>, 23 F.3d 576, 581 (1st Cir. 1994), the entire record will be scrutinized in the light most favorable to the nonmovant, with all reasonable inferences indulged in that party's favor, <u>Smith v. Stratus Computer, Inc.</u>, 40 F.3d 11, 12 (1st Cir. 1994), <u>cert. denied</u>, 63 U.S.L.W. 3817 (U.S. May 15, 1995) (No. 94-1416); <u>see also</u> <u>Woods v. Friction Materials, Inc.</u>, 30 F.3d 255, 259 (1st Cir. 1994); <u>Maldonado-Denis</u>, <u>supra</u>, 23 F.3d at 581.

"In general . . . a party seeking summary judgment [is required to] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." <u>National Amusements, Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)), <u>cert. denied</u>, 63 U.S.L.W. 3847 (U.S. May 30, 1995) (No. 94-1630).

> When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact: the failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law.

<u>Smith</u>, <u>supra</u>, 40 F.3d at 12 (citing <u>Celotex</u>, <u>supra</u>, 477 U.S. at

4

322-23; Woods, supra, 30 F.3d at 259).

Although summary judgment is inappropriate when a trialworthy issue is raised, "[t]rialworthiness necessitates 'more than simply show[ing] that there is some metaphysical doubt as to the material facts.'" National Amusements, supra, 43 F.3d at 735 (quoting Matsushida Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (alteration in National Amusements). Thus, "'[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve . . . .'" Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Accordingly, "purely conclusory allegations . . . rank speculation . . . [or] improbable inferences" may be properly discredited by the court, id. (citing Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)), and "'are insufficient to raise a genuine issue of material fact,'" Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (quoting August v. Offices Unlimited, Inc., 981 F.2d 576, 580 (1st Cir. 1992)).

## 2. Interpreting the Indemnity Agreement

AOHS maintains that "[u]nder the terms of the indemnification provision relied upon by [Northern] in its Motion

5

for Summary Judgment, there is no indemnification if the injury was not caused by AOHS's negligence." AOHS's Objection at 4. However, such a strict construction of indemnity provisions, particularly when such provision is included in a construction contract, has been rejected by the New Hampshire Supreme Court. See Commercial Union Assurance Co. v. Brown Co., 120 N.H. 620, 623, 625, 419 A.2d 1111, 1113, 1114 (1980) ("express language is not necessary to obligate a contractor to protect against injuries resulting from the owner's negligence where the parties' intention to afford such protection is clearly evident"); accord Chadwick v. CSI, Ltd., 137 N.H. 515, 523, 629 A.2d 820, 826 (1993) ("Not only have we acknowledged that this contractual approach [indemnity agreements] to allocating insurance burdens is not contrary to public policy, we have acknowledged that it is of particular value to those involved in the construction industry."); Bosse v. Litton Unit Handling Sys., Inc., 646 F.2d 689, 693 (1st Cir. 1981).

"In interpreting indemnity provisions, this court will apply the same rules as are used to interpret contracts generally. In doing so, we consider the written agreement, all its provisions, its subject matter, the situation of the parties at the time the agreement was entered into, and the object intended." R. Zoppo Co. v. City of Manchester, 122 N.H. 1109, 1114, 453 A.2d 1311,

6

1314-15 (1982) (citing <u>Brown Co.</u>, <u>supra</u>, 120 N.H. at 623, 419

A.2d at 1113). Accordingly, this court's starting point is the

Northern-AOHS "Services Agreement" (Agreement) dated May 23,

1990.

The Agreement incorporates the following indemnity

provision:

> 10. <u>Indemnity.</u> Contractor [AOHS] shall
> indemnify and hold NTI [Northern] harmless
> from any and all loss, damages and costs
> (including attorneys' fees) and from all
> claims for injury or death to persons or loss
> of or injury to property, caused by the fault
> or negligence of Contractor, its employees
> and agents, and in any way connected with or
> arising out of this Agreement or the services
> or work performed hereunder. This indemnity
> shall survive the termination or expiration
> of this Agreement.

May 23, 1990, Services Agreement ¶ 10.[4]  Five days prior to the

execution of the Agreement, Northern received from AOHS a

document entitled "Asbestos Abatement Specifications" (AAS). The

AAS is comprised of documents "stipulating what's to be involved

to do the work, length of time, engineering controls, work

practices, required contractor information, [and] general rules

---

[4]AOHS was additionally required under the Agreement to
"represent[] and warrant[] that it does and shall maintain
adequate workers compensation insurance and other employee
insurance coverages required by law . . . [as well as] maintain
adequate public liability insurance to meet its obligations under
this Agreement and to protect the public against damages arising
out of the performance of services hereunder."  May 23, 1990,
Services Agreement ¶ 9.

7

and regulations."  Deposition of Brett S. Moore at 45 (attached

to Northern's Memorandum of Law).[5]  Part X of the AAS provides,

in relevant part,

> 10.1 OTHER SITE SAFETY CONSIDERATIONS
>    A.  The [AOHS Asbestos Field Specialist
> (AFS)] will continuously monitor for
> potential safety hazards and implement
> precautionary measures in conjunction with
> the contractor foreman.
>    Examples of some anticipated safety hazards
> are:
>    - Wet/slippery surfaces
>    - Nails, glass and other sharp objects
>  At the commencement of work, the AFS and
> contractor foreman will identify site safety
> hazards and devise, at that time, any
> precautionary measures needed to be
> implemented at the start of work.
>    Any new hazards should be noted by site
> personnel, be reported to the site AFS, and
> the affected area vacated immediately until
> precautionary measures are devised and
> implemented.

AAS Part 10.1.A (attached to Northern's motion as Exhibit B).[6]


a.  AOHS's Duty to Indemnify

Under the subject indemnity agreement, AOHS must, as it

---

[5]Further supplementing the contract and the AAS is the Technical Proposal Outline (TPO) which, when attached to a formalized contract, "outlines what [AOHS] propose[s] to do for a building owner."  Moore Deposition at 68.

[6]Under the subheading "Project Management and Supervision", the TPO further provides that "AOHS will place technical personnel on-site during abatement to document and oversee that: . . . [s]afe work practices are followed."  TPO at 3 (attached to AOHS's Objection).

concedes, indemnify Northern from any and all loss caused by the fault or negligence of AOHS, its employees, and agents.  See AOHS Memorandum of Law at 4.  However, the indemnity agreement further provides indemnification for loss that is "in any way connected with or arising out of [the Services] Agreement or the services or work performed hereunder."  May 23, 1990, Services Agreement ¶ 10.  Part of the "services or work" AOHS provided for Northern was to "continuously monitor for potential safety hazards and implement precautionary measures in conjunction with the contractor foreman."  AAS Part 10.1.A.[7]  In the view of the

_____

[7]Elaborating on this point, Brett Moore, an AOHS Asbestos Field Specialist responsible for the work at the site, testified as follows:

> Q.  -- we see that the AFS is also responsible for continuously monitoring the project to identify other potential safety hazards of the type described there, correct?
> A.  Yes.
> Q.  And it offers some examples of possible safety hazards, correct?
> A.  Yes.
> Q.  Including wet and slippery surfaces?
> A.  Yes.
> Q.  And that the danger of that is that somebody could slip and fall?
> A.  Yes.
> Q.  And is that the same type of hazard as the hazard, if any, that may have been posed by these bolts in the floor, somebody could trip and fall?
> A.  Yeah.
> Q.  Same type of thing.
> A.  Basically.
> Q.  And if I'm reading this correctly, your

9

court, said provision delineates the duties of the respective parties insofar as work at the site is concerned and thus "assigns liability to the contractor for injuries resulting from the performance of the contract irrespective of whose negligent acts caused the injuries." Brown Co., supra, 120 N.H. at 624, 419 A.2d at 1113.[8]

---

responsibilities on this project included continuously monitoring the project as the owner's on-site representative to watch out for that type of hazard and take appropriate precautions; is that correct?
  A.  That's what the specifications states, yes.

Moore Deposition at 72-73.

[8]The Brown Co. indemnity provision stated:

*Contractor . . . shall indemnify and hold Owner . . .* harmless from any *and all loss* by reason of property damage, bodily injuries, including death resulting therefrom (and all expenses in connection therewith, including attorneys' fees) sustained or alleged to be sustained by any person or persons, whether they be employees of Owner, Contractor, or members of the public, and without regard to whether the person or persons are working within the scope of their employment, *resulting from the acts* (or failure to act) *of Contractor or sub-contractors, or their employees and agents, or from the performance* (or failure of performance) *of this Contract.*

Brown Co., supra, 120 N.H. at 622, 419 A.2d at 1112.  The New Hampshire Supreme Court found this to be a two-part indemnification agreement, requiring "the contractor to indemnify the owner from any and all loss resulting from: (1) 'the acts of

10

This conclusion adheres foursquare with the result obtained in Bosse, supra, 646 F.2d at 693.[9]  Finding that "the plain language of the agreement points toward indemnification whenever [indemnitor] is found at fault, regardless of [indemnitee's] concurrent negligence," id., the First Circuit offered the following rationale:

> if [indemnitee] were to be barred by its own negligence it would make the agreement pointless.  In any accident where the claim is made that [indemnitee's] negligence contributed with [indemnitor's], there are three possible results: (1) That [indemnitee] was not negligent.  Obviously, in such instance, there would be no need for indemnity.  (2) That [indemnitee's] negligence was passive or secondary.  In such event, [indemnitee] would be entitled to indemnification without an agreement.  Morrissette v. Sears, Roebuck & Co., 1974, 114 N.H. 384, 387, 322 A.2d 7, 9; Sears,

---

[the] contractor'; and (2) 'the performance of this contract.'" Id. at 623, 419 A.2d at 1113.

[9]The indemnity provision at issue in Bosse provided that the contractor would

> "indemnify, hold harmless and defend Buyer and [defendant] from all claims, demands, payments, suits, actions and judgments brought, recovered or executed against it or them on account of death, injury or damage sustained by any party, by reason of any act or omission of Installer or his agents, servants, employees or subcontractors, arising out of the work to be performed hereunder."

Bosse, supra, 646 F.2d at 693.

Roebuck & Co. v. Philip, 1972, 112 N.H. 282, 294 A.2d 211; Wentworth Hotel v. F.A. Gray, Inc., 1970, 110 N.H. 458, 272 A.2d 583. (3) That [indemnitee's] negligence was active. If [indemnitee] were denied recovery whenever its negligence was active, there would never be a time when the agreement served a purpose. It is axiomatic that constructions which render contract terms meaningless or futile are to be avoided. Eastern Gas & Fuel Ass'n v. Midwest-Raleigh, Inc., 4 Cir., 1967, 374 F.2d 451, 454; [R.F.] Robinson Co. v. Drew, 1928, 83 N.H. 459, 462, 144 A. 67, 69. Rather, business parties should be expected not only to give language its normal meaning, but to give "a construction which will make it a rational business instrument." See Berkal v. M. DeMatteo Constr. Co., 1951, 327 Mass. 329, 333, 98 N.E.2d 617, 620.

Id. at 693-94; see also Garbincius v. Boston Edison, 621 F.2d 1171, 1176-77 (1st Cir. 1980); Medina v. Marvirazon Compania Naviera, S.A., 533 F. Supp. 1279, 1291 n.11 (D. Mass. 1982) (discussing Bosse and Garbincius).


    b.  The Bar of Acquiescence

    AOHS attempts to raise a justiciable issue of fact in noting "[b]ecause the existence of the exposed bolts was known to [Northern], and the bolts were left exposed at the direction of [Northern], there is a material issue of fact sufficient to defeat [Northern's] motion for summary judgment . . . ." AOHS Memorandum of Law at 4. Although not clearly stated, AOHS essentially seeks to interpose the doctrine of acquiescence as a

12

bar to Northern's indemnification theory.

As set out in section 95 of the Restatement of the Law of Restitution,

> Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition.

RESTATEMENT OF RESTITUTION § 95 (1937). The question herein raised "is not simply whether the [indemnitee] acquiesced in the dangerous condition, but whether, under the circumstances, the [indemnitee's] knowledge of the dangerous condition is of sufficient character and quality to show that it acted negligently." Illinois Cent. Gulf R.R. Co. v. Crown Zellerbach Corp., 859 F.2d 386, 391 (5th Cir. 1988) (citing Burlington N., Inc. v. Hughes Bros., Inc., 671 F.2d 279, 286 (8th Cir. 1982)); see also Kole v. AMFAC, Inc., 665 F. Supp. 1460, 1465 (D. Haw. 1987) ("Acquiescence requires more than mere knowledge of the dangerous condition. The knowledge must be combined with an acquiescence so as to make the defendant a joint

13

participant.").[10]

The evidence before the court establishes that as a result of the pre-bid site walkthrough, conducted by AOHS for the benefit of the prospective abatement contractors, it became known to all that exposed floor bolts would be present on the site and that such a situation would continue until the abatement process had been completed and the fences reinstalled.

> Q. Do you recall, at any time, any discussions about whether it was safe to leave the bolts sticking up?
> A. No. It was a known job condition pointed out by the would[-]be contractors, and it was their recommendation that someone else take the fencing down, that the bolts be left in place until they could scrape off the tiles and plastic, and they understood that the intent was to reinstall the fencing and posts, bolts, et cetera after the project was complete.
> . . . .
> Q. Now, if you would, maybe you can help me through this. At the outset, was it at all times believed that those bolts would be left in the floor? Was that part of the specification of the project?
> A. Yes, to the best of my knowledge, the intent was to get the base plates and the posts up, the fences up, they would come along and scrape up the tile, the plastic, underneath, the floor would dry under this

---

[10]In this regard, "acquiescence as established by a 'long continued awareness of a dangerous situation by the indemnitee without either taking any corrective measure or calling upon the indemnitor to do so' may constitute negligence." Crown Zellerbach, supra, 859 F.2d at 391 (quoting Burlington, supra, 671 F.2d at 286) (emphasis added) (other citation omitted).

process, after the solvent was supposed to
evaporate off, be washed, painted in some
locations, and carpet laid in other
locations, and then, at a future date, the
appropriate fencing could be put back in the
same locales.
    Q.  Was that a specification at the time of
the pre-bid walk through?
    A.  No--well, let me correct that.  It was
not thought about at the time of the pre-bid
walk through.  AOHS, perhaps, had not, in
their original specifications, even
contemplated what to do with the fencing.  As
I understand it, [at] the walk through, they
said, what are you doing about the fencing,
and everybody went, sort of.  (Indicating)
.  .  .  .
    Q.  Once the fencing was identified and the
need or the desire, in any event, for the
bolts to remain there, was that memorialized
to a document form?
    A.  My understanding was that AOHS, after
the walk through, issued an amendment or
addendum to the specifications that dealt
with that and a number of other issues.  I
never saw such a document.[11]

Deposition of William Norton at 66, 94-95 (attached to AOHS's

Objection).

Moreover, once the abatement process was underway, only IES

and AOHS had access to the site.

    Q.  And, once Mr. Rodriquez and the other
    contractors at IES were on the scene, who had
    access to the building after they arrived?

_____

    [11]AOHS issued said addendum on May 18, 1990, to all asbestos
abatement contractors who attended the May 18 pre-bid walkthrough
of the site.  Item 1 of the addendum notes, "In addition, the
gates located in the main manufacturing area shall be removed
prior to May 28, 1990."  May 18, 1990, Addendum to AAS at 1
(attached to Northern's Memorandum of Law as Exhibit B).

15

A.   Only they did.

Q.   You have described on several instances the manner in which the area was cordoned off.  Did that include the entire building?

A.   Yes.

Q.   So, no one, other than AOHS or IES employees could enter the building during the course of the asbestos removal?

A.   That's correct.

Norton Deposition at 111.  Brett Moore, the AOHS field specialist at the site, testified at his deposition regarding the extent of Northern's knowledge of the allegedly hazardous condition caused by the gate removal.

Q.   When you identified this potential hazard, it was your responsibility to determine what needed to be done?

A.   Yes.

Q.   And you did that?

A.   Yes.

Q.   And what you felt needed to be done was to make the foreman of the [IES] crew that was working around that area aware of it, so he could tell his workers?

A.   Yes.

Q.   That was your decision?

A.   Yes.

Q.   To No. 1, identify the hazard and No. 2, decide what to do about it, correct?

A.   Yes.

Q.   You didn't consult with anyone from [Northern] about that issue?

A.   No.

Q.   Because your company and you were [Northern's] on-site representative to deal with those issues, correct?

A.   Yes.

Moore Deposition at 77-78.

The court hereby finds and rules that Northern's knowledge

16

that removal of the gates would create an exposed bolt condition is insufficient to raise a bar to and prevent operation of the AOHS indemnity provision. The potential problem posed by the exposed bolts was a condition known to all, especially AOHS, prior to the May 23, 1990, Services Agreement. In so entering the Agreement, which included the subject indemnity language, the risk for the allegedly hazardous condition shifted to AOHS. E.g., Bosse, supra, 646 F.2d at 694 ("Where the indemnitor is the one on the job, and in control of the work, it will likely be the party best suited to prevent the loss in the first place and to defend the action if one occurs.").

As between Northern and AOHS, the latter was not only in effective control of the demised premises, but had specifically contracted with Northern to maintain said premises in a safe condition. The basis for finding Northern negligent under the present circumstances would be solely due to their status as legal owner of the site.[12] Thus, notwithstanding any express indemnification provision, any finding of negligence on the part of Northern would be passive, to which an implied right of indemnity would arise. See Getty Petroleum Corp. v. Aris Getty,

_____

[12]Under the instant facts and circumstances, court herewith finds and rules that the doctrine of acquiescence is inapplicable. See Kole, supra, 665 F. Supp. at 1465.

17

Inc., ___ F.3d ___, ___ n.1, No. 94-2241, 1995 WL 341536, at *2 n.1 (1st Cir. June 13, 1995) ("Indemnity is permitted only when one does not join in the negligent act but is exposed to derivative or vicarious liability for the wrongful act of another. In such cases the court has held that plaintiffs in the indemnity actions had no participation in the negligence of the defendants.") (citing <u>Garbincius</u>, <u>supra</u>, 621 F.2d at 1176).

Accordingly, Northern's motion for summary judgment on the issue of indemnity must be and herewith is granted.

<u>Conclusion</u>

For the reasons set forth herein, third-party plaintiff Northern Telecom's motion for summary judgment (document 41) is granted.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

June 15, 1995

cc: Kenneth G. Bouchard, Esq.
    Dennis L. Hallisey, Esq.
    Jeffrey S. Cohen, Esq.
    Raymond A. Cloutier, Esq.
    Robert C. Dewhirst, Esq.

18