WALKER ENGINEERING, INC., Appellant,

v.

BRACEBRIDGE CORP. f/k/a MBNA Texas Properties, Inc., Appellee.

No. 05–02–01295–CV.

Court of Appeals of Texas, Dallas.

April 1, 2003.

Rehearing Overruled May 9, 2003.

Gregory R. Ave, Dallas, for Appellant.

Daena Goldsmith Ramsey, Schell, Quillin, Mitchell, & Cooley, L.L.P., Peter T. Martin, Martin, Miller & Price, L.L.C., Dallas, for Appellee.

Before Justices MORRIS, WHITTINGTON and FRANCIS.

## OPINION

Opinion By Justice WHITTINGTON.

Walker Engineering, Inc. appeals the trial court's judgment in favor of Brace-bridge Corp. f/k/a MBNA Texas Properties, Inc. ("MBNA"). In seven issues, Walker contends the trial judge erred in granting judgment in favor of MBNA and denying Walker relief because MBNA contractually waived its right to sue Walker for damages. We reverse the trial court's judgment and render judgment for Walker.

## BACKGROUND

On July 2, 1997, MBNA and Austin Commercial Inc. entered into a construction contract relating to an MBNA property known as the Hallmark Center in Dallas (the "Contract"). The Contract provided for the addition of a parking garage and an office building as well as improvements to the existing building at the Hallmark Center. The Contract included the "General Conditions of the Contract for Construction" form promulgated by the American Institute of Architects ("AIA"), with certain modifications agreed to by the parties. In May 1997, Austin hired Walker to perform certain electrical work at the Hallmark Center. On September 9, 1997, while two of Walker's employees were performing electrical work in a hallway of the existing building, an electrical arc or short occurred, creating a hole in a nearby water line. As a result of the water leak, a significant portion of the first floor of the existing building flooded, causing extensive damage to the building, the building's fixtures, and the personal property in the flooded area.

At all relevant times, MBNA was insured by Vigilant Insurance Company. MBNA was the insured under a Financial Institutions Insurance Coverage Policy effective March 1, 1997 to March 1, 1998, bearing policy number 3530–65–28 (the "Vigilant Policy"). The Vigilant Policy provided MBNA with over $800 million in

building and personal property coverage. The parties agree the Vigilant Policy covers the water damage at issue in this case. The Vigilant Policy also included "Financial Institutions Building Under Construction Insurance" for the new construction and improvements at Hallmark Center, bearing an effective date of March 25, 1997, and providing limits of $49,137,938. We will refer to this latter coverage as "Builder's Risk."

After MBNA sued Walker and others for declaratory judgment and damages, the parties agreed to present the case to the trial court on stipulated facts. The parties agreed that Walker's negligence alone was the proximate cause of the damages sought by MBNA, and further stipulated to amounts of damages incurred by each party. The core of the dispute involved the construction and application of the waiver of subrogation provision contained in the General Conditions of the Contract. MBNA contended neither the waiver of subrogation provision nor any other provision in the Contract precluded its recovery of damages. In contrast, Walker claimed the waiver of subrogation provision and MBNA's property insurance covering the existing portions of the Hallmark Center at the time of the loss operated to preclude MBNA's recovery of damages. On July 31, 2002, the trial judge signed a judgment finding Walker liable to MBNA for the $1.6 million in damages the parties stipulated MBNA incurred as a result of the flooding of the existing Hallmark Center building. This appeal followed.

### Standard of Review

This dispute was presented to the trial court on stipulated facts under rule 263 of the Texas Rules of Civil Procedure. Tex.R. Civ. P. 263. Thus, we review the trial court's judgment *de novo*, as explained by the court in *State Farm Lloyds v. Kessler*, 932 S.W.2d 732, 735 (Tex.App.-Fort Worth 1996, writ denied):

> An agreed statement of facts under rule 263 is similar to a special verdict; it is the parties' request for judgment under the applicable law. The only issue on appeal is whether the trial court properly applied the law to the agreed facts. The appellate court is limited to those facts unless other facts are necessarily implied from the express facts in the statement. In an appeal of an "agreed" case, there are no presumed findings in favor of the judgment, and the pleadings are immaterial.
>
> Because the issue on appeal is a pure question of law, the appellate court performs a de novo review. A de novo review is less deferential than ordinary reviews because a trial court has *no* discretion in deciding what the law is or in properly applying it.

*State Farm Lloyds*, 932 S.W.2d at 735 (citations and footnotes omitted). Thus, we determine whether the trial judge properly applied the law to the parties' stipulations.

### Discussion

Walker's seven points of error are premised on the assertion that MBNA has contractually waived its right to sue for damages arising out of Walker's negligence. Walker relies on paragraph 11.3.7 of the Contract, which provides in relevant part:

> **11.3.7 Waivers of Subrogation.** The Owner [here, MBNA] and Contractor [here, Austin Commercial, Inc.] waive all rights against (1) each other and any of their subcontractors [here, including Walker], sub-subcontractors, agents and employees, each of the other ... for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Para-

graph 11.3 or other property insurance applicable to the Work. . . . The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification . . . .

Walker argues MBNA waived the right to sue for the flooding of Hallmark Center because the damages for the flooding were "covered by . . . other property insurance applicable to the Work."[1] In contrast, MBNA argues there was no waiver because the flooding was neither covered by insurance obtained pursuant to Paragraph 11.3 nor "covered by . . . other property insurance applicable to the Work."

Paragraph 11.3.1 of the Contract required MBNA to "purchase and maintain . . . property insurance in the amount of the initial Contract Sum as well as subsequent modifications thereto for the entire Work at the site on a replacement cost basis without voluntary deductibles." The "initial Contract Sum" was $49,378,143. MBNA contends it met this requirement by obtaining the Builder's Risk coverage. When MBNA purchased coverage "pursuant to this Paragraph 11.3," MBNA argues, it limited the scope of its waiver to the extent of that coverage. For the portion of the loss covered by the Vigilant Policy, MBNA urges there was no waiver of its right to sue Walker for its negligence, because the Vigilant Policy was not "applicable to the Work."

Walker, in contrast, argues "MBNA's property insurance covered the loss result-

ing from Walker's performance of the work." Walker contends paragraph 11.3.7 extends to any loss arising out of the Work which is covered by property insurance carried by MBNA. Thus, Walker contends the waiver extends to losses under both the Builder's Risk coverage and the Vigilant Policy. Walker contends the waiver applies whether the insurance applicable to the loss is in the form of builder's risk coverage or property insurance covering an existing structure. Walker frames the issue as "whether the loss arises out of the performance of the Work and is covered by the owner's property insurance, regardless of its particular form."

We agree with Walker and conclude MBNA agreed to waive its right to recover against Walker for the property damage at issue here which the parties stipulate was covered by MBNA's insurance. A review of the Contract and the case law interpreting similar AIA contract provisions reveals the parties agreed MBNA's property coverage would protect all parties from property loss. MBNA's procuring the Builder's Risk coverage did not change or limit this agreement.

Under the Contract itself, the parties agree to allocate certain risks between them. The Contract requires MBNA, the owner, to purchase property insurance on an "all-risk policy form," "for the *entire Work* at the site." (Emphasis added). This insurance "shall include the interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Work." Although these provisions reference the

---

1. "Work" is defined in the Contract as "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project. The Work includes, without limitation, all labor, materials, equipment, and services provided or to be provided by Subcontractors, Sub-subcontractors, material suppliers, or any other entity for whom Contractor is responsible under or pursuant to the Contract Documents . . .".

"Work," the waiver of subrogation provision does not look to whether the property damage is to the "entire Work at the site" or to property other than the Work. Rather, paragraph 11.3.7 focuses on the available property insurance coverage and requires waiver between the owner and contractor of "all rights against ... each other ... for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 11.3 or other property insurance applicable to the Work ...". This waiver is "effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise." In addition, paragraph 11.3.5 of the Contract requires the same waiver for property "adjoining or adjacent to the site" if covered by separate property insurance, contemplating waiver as to covered "non-Work" property.

Courts reviewing this allocation of risks and the waiver of subrogation provision have concluded the purpose of these provisions is to eliminate the need for lawsuits by protecting all contracting parties from property loss under the owner's property insurance. In *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724 (Tex.App.-Dallas 1992, writ denied), we said:

> Section 11.3.6 [waiver of subrogation] of the contract operates as a waiver as to all rights of the owner and contractor against the subcontractors for damages caused by fire or other perils to the extent that such damages are covered by insurance obtained pursuant to section 11.3.1. *Section 11.3.1 places an affirmative duty upon the owner to procure property insurance that covers the interests of the owner, the contractor, and the subcontractors.* If the owner fails to purchase adequate insurance and fails to notify the contractor that the project is underinsured, the owner bears the risk of loss to the extent that damages are not covered by insurance. *The policy underlying these clauses is to avoid disruption and disputes among the parties to the project. The need for lawsuits between the parties is eliminated because all contracting parties are protected from property loss under the owner's property insurance.*
>
> Under section 11.3.6 of the construction contract, Old Orchard and Greener & Sumner waived all rights against each other, the subcontractors, sub-subcontractors, agents, and employees of each other for damages caused by fire or other perils to the extent that the damages were covered by insurance.

*Temple EasTex, Inc.*, 848 S.W.2d at 730–31 (citations omitted) (emphasis added).

Similarly, in *Tokio Marine and Fire Insurance Co. v. Employers Insurance of Wausau*, 786 F.2d 101, 104 (2nd Cir.1986), the court noted: "A waiver of subrogation is useful in [construction] projects because it avoids disruption and disputes among the parties to the project. It thus eliminates the need for lawsuits, and yet protects the contracting parties from loss by bringing all property damage under the all risks builder's property insurance." The *Tokio* court concluded the purpose of the waiver of subrogation provision was "in effect [to] simply require one of the parties to the contract to provide [property] insurance for all of the parties." *Tokio Marine & Fire Ins. Co.* 786 F.2d at 105, *quoting Bd. of Educ. v. Valden Assocs., Inc.*, 46 N.Y.2d 653, 416 N.Y.S.2d 202, 389 N.E.2d 798, 799 (1979) (per curiam). The *Tokio* court also quoted favorably from *Housing Investment Corp. v. Carris*, 389 So.2d 689, 690 (Fla.Dist.Ct.App.1980): "[T]he only reasonably conceivable purpose of a construction contract provision placing an ob-

ligation on the owner to carry insurance is to benefit the contractor by providing him protection and exculpation from risk of liability for the insured loss. . . . [T]he contract insurance provision is valuable to the contractor for the very purpose . . . [of] limit[ing] the owner to insurance proceeds even though the loss was caused by the negligence of the contractor." *See Tokio Marine & Fire Ins. Co.* 786 F.2d at 105.

The court in *Trinity Universal Insurance Co. v. Bill Cox Construction, Inc.*, 75 S.W.3d 6 (Tex.App.-San Antonio 2001, no pet.), also discussed the purpose of the waiver of subrogation provision, quoting the dissent in *S.S.D.W. Co. v. Brisk Waterproofing Co.*, 76 N.Y.2d 228, 557 N.Y.S.2d 290, 556 N.E.2d 1097, 1103 (N.Y.1990): "[T]hese subrogation waiver clauses are intended to avoid litigation over claims for damages while also protecting the parties by 'in effect simply requir[ing] one of the parties to the contract to provide insurance for all of the parties.'" *Trinity*, 75 S.W.3d at 13, *quoting S.S.D.W. Co.*, 557 N.Y.S.2d 290, 556 N.E.2d at 1103 (Alexander, J., dissenting). The owner is "required to insure against damage to the building and to waive all claims against the contractor for losses covered by that insurance;" therefore, "the owner's recovery for these losses is limited to its insurance proceeds and neither the owner, nor its insurer (as subrogee) has any cause of action against the contractor." *Trinity*, 75 S.W.3d at 13, *quoting S.S.D.W. Co.*, 557 N.Y.S.2d 290, 556 N.E.2d at 1103 (Alexander, J., dissenting).

Both parties cite the *Trinity* case in support of their position. In *Trinity*, an identical waiver of subrogation clause barred suit by the owner's insurer against a negligent subcontractor. There, a subcontractor's negligence caused a fire. The court held the scope of the waiver provision in the standard AIA contract was

determined by whether the owner's policy provided coverage for losses arising from damage to the property, not whether the injury was to "Work" or "non-Work." *Trinity*, 75 S.W.3d at 13. Because the damages suffered by the owner due to the fire were covered by the owner's insurance policy, the policy constituted "other property insurance applicable to the Work," and the waiver of subrogation clause applied to prevent the insurer from suing the subcontractor. *Trinity*, 75 S.W.3d at 15. The *Trinity* court stated it was following the "reasoning adopted by the majority of jurisdictions addressing this issue," and cited cases from several different states. *Trinity*, 75 S.W.3d at 11–15.

The *Trinity* court rejected the reasoning of cases limiting the waiver to the "Work," such as *S.S.D.W. Co.*, in favor of cases such as *Lloyd's Underwriters v. Craig and Rush, Inc.*, 26 Cal.App.4th 1194, 32 Cal. Rptr.2d 144 (1994), which define the scope of waived claims by the source of insurance proceeds paying for the loss rather than by what property (*i.e.*, Work or non-Work) is harmed. *Trinity*, 75 S.W.3d at 12. *See also Chadwick v. CSI, Ltd.*, 137 N.H. 515, 629 A.2d 820, 826 (1993) (even though contractor is required under AIA contract to purchase liability coverage and indemnify owner for damage to non-Work, waiver of subrogation was effective as to both Work and non-Work because waiver provision applies "even though [a] person or entity would otherwise have a duty of indemnification, contractual or otherwise"). In rejecting cases limiting the waiver of subrogation to damage to the actual work under the contract, the *Trinity* court quoted from the dissenting opinion in *S.S.D.W.:* "This limited construction of the subrogation waiver clause . . . undermines the very purpose of the clause. Rather than promoting certainty as to the liability of the parties to these standard contracts, the majority's construction of this standard

waiver clause invites litigation as to whether the damages in any particular case fall within the scope of the work to be performed under the contract." *Trinity*, 75 S.W.3d at 13, *quoting S.S.D.W. Co.*, 557 N.Y.S.2d 290, 556 N.E.2d at 1102 (Alexander, J., dissenting).

Walker urges *Trinity* is precisely on point because here, the Vigilant Policy undisputedly covered the damages to Hallmark Center from the flooding. MBNA, in contrast, argues *Trinity* would not require application of the waiver of subrogation clause because MBNA purchased separate coverage for the Work, unlike the owner in *Trinity*.

MBNA correctly notes that in *Trinity* and the other "majority rule" cases on which *Trinity* relies, no specific builder's risk policy was purchased; rather, the owner chose to rely on preexisting insurance broader than that called for in the contract. Each court assumed the result would be different if the owner had not chosen to rely on the pre-existing insurance but rather had purchased separate coverage, but no court was actually presented with those facts. *See, e.g., Trinity*, 75 S.W.3d at 15 ("The owner agrees to waive the right to sue for damages done only to the 'work' if it purchases a separate all-risk policy specifically to cover the 'work.' But if the owner relies on an existing policy which is so broad that it covers both 'work' and 'nonwork' property, it waives the right to sue for all damages done as long as that damage is covered by the policy."); *see also Employers Mut. Cas. Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490, 493 (Minn.1998) (owner relied on existing policy; court noted owner has option to purchase all-risk policy specifically to cover the "work" or rely on existing property insurance; if owner purchases separate coverage, waiver is only as to damages done to the "work"); *Lloyd's Underwrit-*

*ers*, 32 Cal.Rptr.2d at 148 ("We caution there may have been a different result [than waiver] had Owner procured a specific policy, such as a 'builder's risk' policy the protection of which was limited to the Work itself, rather than having relied on appellants' 'all-risk' policy to cover the Work."); *ASIC II Ltd. v. Stonhard, Inc.*, 63 F.Supp.2d 85, 92 (D.Me.1999) ("NSC [the owner] chose not to obtain separate insurance . . .", so waiver was not restricted to damages to "Work"); *Haemonetics Corp. v. Brophy & Phillips Co., Inc.*, 23 Mass.App.Ct. 254, 501 N.E.2d 524, 526 (1986) ("The preexisting insurance policy the owner had . . . was the insurance the owner chose to provide to comply with § 11.3 even though that policy may have been more extensive than what was required.").

A court actually presented with the question whether the purchase of specific coverage for construction limited the waiver to the scope of only that coverage, however, followed the majority rule nonetheless. In *Independent School District 833 v. Bor–Son Constr., Inc.*, 631 N.W.2d 437 (Minn.Ct.App.2001, review denied), the court held the owner had waived the right to sue for damage to "non-Work" even though it had purchased a builders' risk endorsement to cover the construction. The court reasoned the endorsement was not separate coverage, but only an amendment that became part of the underlying, pre-existing policy. *Bor–Son Construction, Inc.*, 631 N.W.2d at 441. Thus, the pre-existing insurance plus the builder's risk endorsement constituted a single policy providing coverage for damage to both "Work" and "non-Work," and the waiver of subrogation applied to both types of damage. *Bor–Son Construction, Inc.*, 631 N.W.2d at 440–41. The parties dispute whether the Vigilant Policy and the Builder's Risk coverage are "separate" policies. They stipulated as follows:

*Fact No. 7:* At all relevant times, Vigilant insured MBNA under Financial Institutions Insurance Coverage Policy Number 3530–065–28, effective March 1, 1997, to March 1, 1998 ("the Vigilant policy").

*Fact No. 8:* A true and correct copy of the Vigilant policy is attached hereto as Exhibit "D."

*Fact No. 9:* The Vigilant policy provided builder's risk coverage to MBNA for the new construction and improvements at the Hallmark Center. Separate coverage was also provided by Vigilant for the existing Hallmark Center building for certain risks outlined in the policy, including the water damage which is the subject of and reflected in stipulation of fact number 21.

Stipulation 9 supports both parties' arguments. It describes the Builder's Risk coverage as "provided" under the Vigilant Policy, but also describes the Vigilant Policy's coverage of the existing building as "separate." An examination of the Vigilant Policy in the record indicates the Builder's Risk insurance is intended to be part of the Vigilant Policy. The Vigilant Policy's declarations page provides "These Declarations with Insurances, Conditions, Loss Provisions, Definitions and Amendments complete the policy." The Builder's Risk coverage appears to be one of the included "Insurances." It bears the same policy number as the Vigilant Policy; it cross-references several of the Vigilant Policy's forms; and its declarations page specifying a "building under construction" at the Hallmark Center address is one of a dozen similar pages for other buildings under construction that precede the form for the actual terms and conditions of the "building under construction insurance." Thus, the Builder's Risk insurance appears to be part of a larger insurance policy providing various types and amounts of coverage to MBNA. Following the reasoning of the *Bor–Son* court, the waiver of subrogation would extend to damages covered by the entire Vigilant Policy, including the Builder's Risk coverage but not limited to it.

Regardless of whether a "separate" policy exists, however, we conclude the waiver of subrogation provision applies here to preclude MBNA's suit against Walker. As we stated in *Temple EasTex, Inc.,* the parties agreed in advance to "avoid disruption and disputes" by agreeing that "all contracting parties are protected from property loss under the owner's property insurance." *See Temple EasTex, Inc.,* 848 S.W.2d at 730–31. MBNA's addition of specific builder's risk coverage to its existing property coverage did not change this agreement. The parties stipulated the damages from Walker's negligent performance of the Work were covered by MBNA's property insurance. Thus, as in *Trinity,* MBNA's insurance was "applicable to the Work" under the waiver of subrogation clause. *See Trinity,* 75 S.W.3d at 15 ("the clause ['applicable to the Work'] refers to insurance applicable to the location of the work or the building containing the work as that is the type of insurance contemplated by [the waiver clause].... Because the damages suffered by [the owner] due to the fire were covered by the Trinity policy, the policy constitutes 'other property insurance applicable to the Work.' "). To the extent the property damage at issue was covered by MBNA's insurance, MBNA waived its right to sue Walker.

The only issues presented on appeal regard the scope of MBNA's contractual waiver. We make no holding regarding whether the Builder's Risk insurance, in covering the "building under construction" at Hallmark Center, or the Vigilant Policy, in covering losses to property, should or

did cover some or all of the damage caused by Walker carrying out its duties under the Contract. On this appeal, we are limited to the stipulated facts and other facts necessarily implied from them. *State Farm Lloyds,* 932 S.W.2d at 735.

We reverse the judgment of the trial court and render judgment for Walker in accordance with the parties' stipulations.