**JALAPENOS, LLC, Appellant**

v.

**GRC GENERAL CONTRACTOR, INC., Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 24, 2007.

Filed Dec. 19, 2007.

Larry W. Miller, Jr., West Lawn, for appellant.

Scott D. McCarroll, Harrisburg, for appellee.

BEFORE: STEVENS, BENDER, and DANIELS, JJ.

OPINION BY DANIELS, J.:

¶ 1 This is an appeal from the lower court's order, entered on October 28, 2006, which granted summary judgment in favor of Appellee. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 The lower court has set forth the factual and procedural background of this matter as follows:

[Appellant] filed a complaint alleging [that Appellee] was liable under theories of breach of contract and negligence as a result of a fire which occurred on premises being rented and remodeled by [Appellant] for use as a Mexican restaurant. [Appellant] alleged [that] an employee of a subcontractor to [Appellee] caused the fire. After the close of the pleadings and the conclusion of discovery, [Appellee] filed a motion for summary judgment[,] which [Appellant] answered.

Counsel filed briefs, the court heard oral argument on August 3, 2006[,] and granted the motion by Opinion and Order dated October 28, 2006. [Appellant] appealed that ruling and filed a concise statement of matters complained of on appeal.

On February 25, 2004, Appellant hired Appellee to convert a former fast-food establishment into a Mexican-style restaurant. The contract was a standard form agreement generated by the American Institute of Architects [AIA] and is routinely used in remodeling and renovating construction projects throughout this country [AIA forms A101–1997 and A201–1997]. Section 11.4.1 of the contract stated [that Appellant] would purchase and maintain property insurance written on a builder's risk "all-risk" policy, the purpose of which was to insure against the peril of fire. The contract stated that if [Appellant] did not intent to purchase such insurance, [then Appellant] was to so inform [Appellee] in writing before the work began. § 11.4.1.2. If [Appellee] were damaged by [Appellant's] failure to buy or maintain the insurance without notifying [Appellee] in writing, [Appellant] would then bear all reasonable costs attributable to such failure to buy or maintain the insurance § 11.4.1.2. The contract further stated [that Appellant] waived all rights of action against [Appellee] for loss of the use of [Appellant's] property, including consequential losses due to fire or other hazards, however caused. § 11.4.3.

[Appellee] began work on the premises shortly after the parties signed the contract. A fire occurred on or about April 23, 2004[,] which caused significant damage to the premises and this prevented [Appellee] from completing the renovations.

The record undisputedly revealed two key facts: [Appellant] did not purchase and maintain the all-risk property insurance and also failed to notify [Appellee] in writing that [Appellant] had not purchased or maintained insurance as required by the contract. § 11.4. [Appellee] argued in its motion for summary judgment that [Appellant's] failure to comply with these provisions barred [Appellant] from recovering any damages as a matter of law. [Appellant] responded to the motion with the following arguments: (1) Section 11.4 et seq. does not determine the assignment of liability for damages arising from the performance of the contractor's or subcontractor's work. Instead, [S]ection 3.18.1 pertaining to indemnification should control the outcome; (2) Section 11.4 et seq. as interpreted by [Appellee] is contrary to public policy because it purported to allow [Appellant] to contract away its right to sue [Appellee] for its alleged negligence in starting the fire, and [Appellant,] in signing this contract[,] was a party with unequal bargaining power.

Lower Court's 1925(a) Opinion, 3/27/07, pp. 1–3.

¶ 3 The lower court granted summary judgment in favor of Appellee. This appeal followed.

### QUESTIONS ON APPEAL

¶ 4 Appellant presents the following questions for our review:

1. Does the contract signed by the parties in this case require [Appellant] to insure against the negligence of [Appellee]?

2. Even if the contract does require [Appellant] to insure against the negligence of [Appellee], as [Appellee] alleges it does, does Pennsylvania common law permit enforcement of such a contract?

3. Was [Appellee] entitled to a Summary Judgment when there were existing factual issues left for the jury?

Appellant's Brief, p. 4.

### DISCUSSION

■ ¶ 5 Our standard of review and the general rule for reviewing a lower court's grant or denial of summary judgment is as follows:

Our review on an appeal from the grant of a motion for summary judgment is well-settled. A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 590, 777 A.2d 418, 429 (2001) (Internal Citations and Quotation Marks Omitted).

■ ¶ 6 Appellant's first assignment of error asserts that the lower court erred when it determined that Section 11.4 of the standard AIA contract ("Property Insurance") governed this dispute, so that Appellant's claims were precluded on the basis of that section's mutual "waiver of subrogation" provision. The relevant provisions of Section 11.4 of the standard AIA contract, which were not modified by the contracting parties in this litigation, read as follows:

11.4 PROPERTY INSURANCE

11.4.1 Unless otherwise provided, *the Owner shall purchase and maintain,* in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, *property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum,* plus value of subsequent Contract modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Paragraph 9.10 or until no person or entity other than the Owner has an insurable interest in the property required by this Paragraph 11.4 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project.

11.4.1.1 *Property insurance shall be on an "all-risk" or equivalent policy form* and shall include, without limitation, insurance against the perils of fire (with

extended coverage) and physical loss or damage. . . .

11.4.1.2 *If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work* . . . . If the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor in writing, then *the Owner shall bear all reasonable costs properly attributable thereto.*

. . .

11.4.3 Loss of Use Insurance. The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Contractor for loss of use of the Owner's property, including consequential losses due to fire or other hazards however caused.

. . .

11.4.7 Waivers of Subrogation. The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other . . . for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Paragraph 11.4 . . . except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. . . . A waiver of subrogation shall be effective as to a person or entity even

though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

AIA Document No. A201–1997, "General Conditions of the Contract for Construction" (Emphasis Added).

¶ 7 The lower court held that the record "undisputedly revealed two key facts: [Appellant] did not purchase and maintain the all-risk property insurance and also failed to notify [Appellee] in writing that [Appellant] had not purchased or maintained insurance as required by the contract [in Section] 11.4." Lower Court's 1925(a) Opinion, 3/27/07, p. 2. In the lower court's analysis, the clear purpose of contract provisions like those in Section 11.4 "is to shift the risk of loss away from the owner and the contractor" and place it upon the "[owner's] insurer, or on the [owner] if the [owner] does not obtain insurance and fails to notify [the contractor] of this fact, a failure which deprive[s] [the contractor] of the opportunity to itself obtain such insurance." Lower Court's 1925(a) Opinion, 3/27/07, p. 5. Because Section 11.4 governed, the lower court concluded that Section 11.4.7, the contract's "waiver of subrogation" provision, precluded Appellant's claims against Appellee and, thus, Appellee was entitled to summary judgment as a matter of law. Lower Court's 1925(a) Opinion, 3/27/07, p. 3.

¶ 8 Cases interpreting Section 11.4 do not abound within Pennsylvania, but Section 11.4 has been examined in some depth and with consistency by other jurisdictions.[1] In *Knob Noster R–VIII School*

---

1. The general introduction to AIA No. A201 notes that AIA standard forms have been published and used since 1906. The introduction adds that:

*District v. Dankenbring,* 220 S.W.3d 809 (Mo.App. W.D.2007), the Missouri court's discussion is "on all fours" with this case. We quote it extensively, adding emphasis where appropriate:

> In interpreting the waiver of subrogation clause at issue in this case, this court in *Nodaway [Valley Bank v. E.L. Crawford Const., Inc.,* 126 S.W.3d 820 (Mo.App.2004)]* determined that, under the plain language of the clause, *the clause prevents an owner from pursuing a claim against a contractor and subcontractor for damage allegedly caused by the contractor and subcontractor to the extent that the damage is covered by property insurance the contract required the owner to obtain ....* The *Nodaway* court noted that a contractual requirement that one party provide property insurance for all of the parties has been deemed significant in determining the intent of the parties in allocating the risk of first-party property loss. More specifically, *courts have held that this type of clause signals that the parties have shifted the risk of first-party property loss from one another to the insurance company.* The court stated, "Because it is economically inefficient for both parties to insure against the same risk, the parties' inclusion of an insurance procurement clause indicates that the parties intended to avoid both parties having to face potential liability for the same risk."
>
> Noting that a property owner can acquire insurance on its own, *the Nodaway court adopted the reasoning of other courts that the explanation for a provision requiring insurance to be procured in a construction contract "is an intention on the part of the parties to relieve each other of liability and look only to one insurer to bear the risk of [damage] instead."* It stated that, if the parties had a contrary intent, "then each party would be responsible for obtaining their own insurance policies, and it would be unnecessary for the contract to place the duty to obtain property insurance covering both parties' interests on one of the parties." The *Nodaway* court observed that several cases reaching the conclusion that the parties have contracted away the risk of first-party property loss have relied upon the presence of an insurance procurement clause alone, without requiring the presence of a waiver of subrogation clause. It noted that the court in *South Tippecanoe School Building Corp. v. Shambaugh & Son, Inc.,* 182 Ind.App. 350, 395 N.E.2d 320, 327 (1979), held that "the insurance procurement requirement 'was intended to constitute the exclusive source for redress of damages sustained,' and the protection afforded by this requirement

AIA contract documents are the product of a consensus-building process aimed at balancing the interests of all parties on the construction project. The documents reflect actual industry practices, not theory. They are state-of-the-art legal documents, regularly revised to keep up with changes in law and the industry—yet they are written, as far as possible, in everyday language.

. . .

[T]he AIA standard documents are intended to be used as fair and balanced baselines from which the parties can negotiate their bargains. As such, the documents have won general acceptance within the construction industry *and have been uniformly interpreted by the courts.* Within an industry spanning 50 states—each free to adopt different, and perhaps contradictory, laws affecting that industry—*AIA documents form the basis for a generally consistent body of construction law.*

AIA Document No. A201–1997, "Instructions".

was 'buttressed' by the waiver of subrogation clause."

*Id.* at 817–18 (Emphasis Added).

¶ 9 Here, it is undisputed that the parties signed the standard AIA contract, leaving undisturbed and unmodified the language of the provisions of Section 11.4. Understanding the language, purpose, and function of Section 11.4, as it has been evaluated in *Knob Noster* we agree with the lower court that it is undisputed that Appellant was obliged to secure the required insurance, and if Appellant did not do so, it was contractually required to advise Appellee in writing of either its decision or failure to do so. It is similarly undisputed that Appellant did not secure the required insurance, nor did it advise Appellee in writing of its failure to do so. Appellant's breach of Section 11.4 of the standard AIA contract is, therefore, not in dispute.

¶ 10 Appellant responds that the AIA contract's "indemnification" provision (Section 3.18) should control. Appellant argues that Section 11.4 entailed no more than its (Appellant's) obligation to obtain "all-coverage liability insurance for the construction coverage before the construction project began", but did not "exculpate [Appellee] from its own negligence." Appellant's Brief, pp. 12, 13. Instead, Appellant argues, Appellee is responsible for the loss because, in Appellant's view, Section 3.18.1 clearly imposes responsibility upon Appellee for "any damages caused by its own negligence or that of its subcontrac-

tors, as was alleged in the Complaint in this case." Appellant's Brief, p. 14.

¶ 11 The lower court rejected this argument, concluding that:

Section 3.18.1 requires the contractor to hold harmless or indemnify the owner for damages occurring as a result of the negligence of the contractor or subcontractor. However, this section specifically excludes from this [requirement] any claims for indemnification arising from 'the Work' [2] itself *and pertains to the contractor's duty to indemnify the owner for losses to third parties.*

Lower Court's 1925(a) Opinion, 3/27/07, p. 5 (Emphasis Added).

¶ 12 The language in Section 3.18.1, to which the lower court referred, is as follows:

To the fullest extent permitted by law and to the extent claims, damages, losses or expenses are not covered by Project Management Protective Liability insurance purchased by the Contractor in accordance with Paragraph 11.3,[3] *the Contractor shall indemnify and hold harmless the Owner ... from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself),* but only to

---

**2.** According to the AIA contract's included definitions, "[t]he term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project."

**3.** The insurance referred to herein and described in Section 11.3 is a separate and optional coverage policy that an owner may require a contractor to purchase. It is not germane here whether Appellant required Appellee to acquire such insurance, but the copy of the original contract as included in the record does not indicate that any additions or modifications to the standard AIA contract were confected herein.

the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 3.18.

AIA Document No. A201–1997, "General Conditions of the Contract for Construction" (Emphasis Added).

¶ 13 The lower court relied upon an unpublished Montana case, *Beartooth Lodge v. Yellowstone Electric Co.*, No. DV 92–17, 1993 Mont. Dist. LEXIS 636 (Carbon County, Mont.1993), which addressed the interplay between Sections 11.4 and 3.18. In *Beartooth Lodge*, as here, the owner alleged fire damage and loss due to negligence by the general contractor or a subcontractor. The *Beartooth Lodge* court, assuming *arguendo* for summary judgment purposes that the contractor was indeed negligent, set forth the relationship between the two sections of the standard AIA contract as follows:

A101 and A201 [the standard contract forms] intentionally make provision for property damage and all risk insurance coverage to be provided by [the owner], all parties waive subrogation for the all risk property damage insurance provided by [the owner] and *the only responsibilities of the contractors, if any, are for liability insurance to cover claims by third parties.* Such provision is an appropriate allocation of risk and responsibilities and makes certain the obligation of the various parties under such contract documents to provide insurance.

*Id.* at *5 (Public Domain Citation, Emphasis Added).

¶ 14 As with *Knob Noster*, we are under no obligation to follow the authority of *Beartooth Lodge*, but we find its analysis of the exact contract provisions that are before us here to be persuasive. We also find *Myers Building Industries, Ltd. v. Interface Technology, Inc.*, 13 Cal.App.4th 949, 17 Cal.Rptr.2d 242, 254 (2d Dist.1993), to be instructive. In that case, the California Court of Appeals analyzed previous versions of these same AIA contract provisions and held, *inter alia*, that:

A clause which contains the words "indemnify" and "hold harmless" is an indemnity clause which generally obligates the indemnitor to reimburse the indemnitee for any damages the indemnitee becomes obligated to pay third persons. Indemnification agreements ordinarily relate to third-party claims.

*Id.* at 254. (Internal Citations Omitted).

¶ 15 Appellant presents no contrary authority that would authorize a contractor's direct liability to an owner under circumstances such as those presented here. We are convinced, therefore, that the lower court committed no error of law in holding that Section 11.4 and its "waiver of subrogation" provision controls the factual circumstances of this matter, and that the "indemnification" provisions of Section 3.18 are not applicable here. Consequently, we find this assignment of error to be without merit.

¶ 16 Appellant's second assignment of error alleges that even if the AIA contract placed the burden of insurance upon Appellant as the project owner, Pennsylvania's common law and public policy concerns do not permit enforcement of a contract in which a party may contract away its potential for liability based upon its own negligence, because such contract would remove the incentive for an entity to

take precautions in its business endeavors. *See Crew v. The Bradstreet Co.,* 134 Pa. 161, 19 A. 500 (1890) ("Contracts against liability for negligence are not favored by the law.").

¶ 17 In response, the lower court observed that:

> [t]he purpose of section 11.4 is to protect *both the owner and the contractor* from the consequences of litigation and losses which might otherwise disrupt performance under the contract. Such protection encourages commercial undertakings such as the one in this case.

Lower Court's 1925(a) opinion, 3/27/07, p. 6 (Emphasis Added).

¶ 18 We agree. In the Connecticut case of *Best Friends Pet Care, Inc. v. Design Learned, Inc.,* 77 Conn.App. 167, 823 A.2d 329 (2003), the court studied a number of other states' approaches to this question and concurred with the consensus it discovered:

> Ultimately, we find persuasive ... the distinction made by the New Hampshire Supreme Court in *Chadwick v. CSI, Ltd.*[, 137 N.H. 515, 629 A.2d 820 (1993) ] In *Chadwick,* the court distinguished between exculpatory provisions, which were forbidden by New Hampshire common law, and allocation of risk provisions, such as the kind found in the AIA contract. These [AIA provisions] do not present the same concerns as naked exculpatory provisions. As opposed to exculpatory provisions ... the insurance provisions of the standard AIA contract are not designed to unilaterally relieve one party from the effects of its future negligence, thereby fore-

closing another party's avenue of recovery. Instead, they work to ensure that injuries or damage incurred during the construction project are covered by the appropriate types and limits of insurance, and that the costs of that coverage are appropriately allocated among the parties."

*Id.* at 334 (Internal Citations Omitted).

¶ 19 In one of the few Pennsylvania cases that addresses this subject, *Penn Avenue Place Associates, L.P. v. Century Steel Erectors, Inc.,* 798 A.2d 256 (Pa.Super.2002), this Court reached a similar conclusion:

> [A] waiver of subrogation clause, such as the one at issue here, does not invoke public policy concerns because it does not attempt to transfer liability for negligence away from the tortfeasor. The public policy concerns regarding indemnification for one's own negligence are therefore not an issue here. Waivers of subrogation are a matter of contract.

*Id.* at 259.

¶ 20 This analysis, which comports with the general consensus reached by courts of this nation concerning the interpretation of the AIA's standard contract forms, leads to the inescapable conclusion that the lower court correctly analyzed the contract at issue here. As such, Appellant's argument that the lower court's decision to grant summary judgment in favor of Appellee violates either public policy or common law principles of this Commonwealth is inapposite in this context.[4] This assignment of error is also without merit.

---

4. Appellant argues at length that the lower court should have undertaken the analysis provided in *Leidy v. Deseret Enterprises, Inc.* 252 Pa.Super. 162, 381 A.2d 164 (1977), which analyzes contracts where one party has contracted away its liability for its own negli-

gence. Because, however, we agree with the analysis of courts in other jurisdictions that have found that Section 11.4 does not violate common law prohibitions of such contracts, Appellant's reliance upon *Leidy* is inapposite.

¶ 21 Appellant's third and final assignment of error asserts that Appellees were not entitled to summary judgment because genuine issues of material fact remain for resolution by a jury. Appellant did not raise this issue precisely in either its 1925(b) statement or its motion for reconsideration of the grant of summary judgment, but because our standard of review regarding the grant or denial of summary judgment, as quoted above, is *de novo* and requires us to determine whether genuine issues of material fact do, in fact, exist, we shall briefly address the merits of this assignment of error. *See Murphy, supra.*

¶ 22 Appellant's first contention in this regard is that the contract should not be enforced because Appellant's principal lacked bargaining power, was at a language disadvantage, and was without representation when he signed the AIA A101 and A201 contract documents presented by Appellee. The lower court rejected this argument "because it would have required the court to look beyond the unequivocal language of section 11.4 et seq. when there was no indication in the record of fraud or other intentional conduct." Lower Court's 1925(a) Opinion, 3/27/07, p. 6.

¶ 23 It is axiomatic that a court may not look to extrinsic or "parol evidence" outside of the express language of a contract unless there is some showing or evidence of fraud, accident, mistake, or ambiguity in the language or making of the contract. *See, e.g., Ragnar Benson, Inc. v. Hempfield Twp. Mun. Auth.*, 916 A.2d 1183 (Pa.Super.2007) (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 854 A.2d 425 (2004)). Here, Appellant suggests that some degree of pressure may have been brought to bear on him by Appellees in order to obtain his signature on the AIA contracts so that work could begin on the project. Our review of the record, including Appellant's principal's affidavit, suggests no abuse of discretion or error of law by the lower court in rejecting that contention. Appellant was, based upon all of the evidence in the record, a business owner with some degree of sophistication and was a knowing and voluntary party to the contract in question. The record contains nothing to suggest that Appellant was in any way prevented from obtaining counseled advice if he chose to do so. As no basis exists for looking beyond the terms of the AIA contract itself, we find that no genuine issues of material fact remain on this particular issue, and that the lower court was entirely justified in granting summary judgment in favor of Appellee.

¶ 24 Appellant argues additionally that because both sides to this dispute have presented disparate versions of the facts, summary judgment should be precluded. That, however, is not the issue before us. The lower court concluded (and Appellant has not disputed) that Appellant failed to obtain the insurance required by Section 11.4 of the AIA standard contract form, and also failed to advise Appellee in writing of its failure to do so. Lower Court's 1925(a) Opinion, 3/27/07, p. 2. As a matter of law, therefore, the lower court concluded that, pursuant to the "waiver of subrogation" provision of Section 11.4, Appellant's claim was barred by the contract language and, therefore, Appellee was entitled to summary judgment. We agree, as we find no abuse of discretion or error of law on the part of the lower court in so concluding.

¶ 25 Appellant's second contention within this assignment of error is that the safety of construction work sites constitutes a public interest such that the lower court should have analyzed the contract as one which illegally attempts to allow one party to contract away potential liability

for its own negligence. This contention is not an assertion that genuine issues of material fact exist, but rather an extension of Appellant's second assignment of error, which we addressed above and have found to be without merit. It need not be reiterated here and, as such, this assignment of error is similarly without merit.

¶ 26 Order of October 28, 2006, granting summary judgment in favor of Appellee, affirmed.