John EVANS, Appellant

v.

SODEXHO.

Superior Court of Pennsylvania.

Submitted Jan. 14, 2008.

Filed April 1, 2008.

Donald P. Russo, Bethlehem, for appellant.

Oldrich Foucek, III, Allentown, for appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS and KELLY, JJ.

OPINION BY FORD ELLIOTT, P.J.:

¶ 1 John Evans ("Evans") appeals the order entered June 6, 2007, granting defendant Sodexho's motion for summary judgment and dismissing Evans' complaint with prejudice. We affirm.

¶ 2 The underlying facts of this case are as follows. Evans began working for the Wood Company ("Wood")[1] in 1982, eventually becoming corporate controller. (Notes of testimony, 1/13/07 at 11, 14.) As the controller, he reported directly to the Chief Financial Officer ("CFO"). (*Id.* at 20.) In November 1999, the board approved a Phantom Unit Appreciation Rights ("UAR") Plan ("the Plan"). (Notes of testimony, 2/27/07 at 17; affidavit of Mark Shipman ("Shipman"), 2/23/07 ¶¶ 8–9.)[2] The Plan was unfunded and limited to members of the Executive Management Team ("EMT") and such other classes of key management employees as determined in writing annually by the Plan administrator. (Notes of testimony, 2/27/07 at 19; affidavit of Shipman, 2/23/07 ¶¶ 10–13.) It is undisputed that Evans was not a member of the EMT, and that the administrator, *i.e.*, the board of directors, never expanded participation in the Plan to any other classes of key management employees.

¶ 3 Evans first became aware of the Plan in February 2000, when preparing the 1999 audit. (Notes of testimony, 1/13/07 at 35–36.) In June 2001, Wood was acquired by Sodexho. (Affidavit of Robert C. Wood, 3/30/07 ¶¶ 5–6.) The sale of Wood's stock to Sodexho was a "change in control" according to the terms of the Plan, thereby accelerating the vesting of all outstanding Phantom UAR's held by the grantees, *i.e.*, the EMT. ("1999 Phantom Unit Appreciation Rights Plan," ¶¶ 1, 9; R.R. 29a–30a, 34a–35a.) The grantees were paid the value of their vested UAR's in August 2001, consistent with the Plan's provision that all vested outstanding Phantom UAR's, including those vested by virtue of the occurrence of the change in control, are deemed exercised as of that date and payable within 60 days. ("1999 Phantom Unit Appreciation Rights Plan," ¶ 9(b); R.R. 34a–35a; Affidavit of Mark R. Adams ("Adams"), 3/29/07 ¶¶ 25–26.)

¶ 4 In April 2001, prior to Wood's acquisition by Sodexho and at least in part because of his dissatisfaction with not being designated a participant in the Plan, Evans resigned. (Notes of testimony, 1/13/07 at 55; affidavit of Shipman, 2/23/07 ¶ 25.) In May 2001, Evans accepted a position as director of special finance projects with the Compass Group. (Notes of testimony, 1/13/07 at 7–8.) He is currently

---

1. Wood and Sodexho are in the food service industry.

2. The Plan was created to attract, retain, and reward certain key executives; it is referred to as a "phantom" stock plan because the shares of stock do not actually exist except on paper. (Notes of testimony, 1/13/07 at 44.) As Shipman stated:

> The concept is to reward key executives while contributing to the growth of the company.

Q. How did it reward executives, these key people?
A. A value of the company was established, I believe in June of '99. And that was measured on an annual basis. And based on the growth of that value of the company, the value of the shares increased.
Q. Those shares were not actually common stock or anything, they were phantom shares?
A. Yes, imaginary.

Notes of testimony, 2/27/07 at 17–18.

a senior accounting manager with Compass. (*Id.* at 8.)

¶ 5 On February 24, 2006, Evans filed a praecipe for a writ of summons; and on September 13, 2006, a complaint was filed in the form of an action to recover benefits pursuant to Section 502(a)(1)(B) of ERISA,[3] 29 U.S.C. § 1132(a)(1)(B).[4] (Docket No. 2.) Therein, Evans averred that as a corporate officer and by virtue of his years of service to the company, he was entitled to participate in the Plan. Evans averred that he was eligible for participation in the Plan and that Sodexho acted with malicious intent in denying him UAR benefits under the Plan.

¶ 6 Sodexho filed its answer and new matter on October 16, 2006, and Evans filed a reply on November 6, 2006. A motion for summary judgment was filed for Sodexho on April 13, 2007, averring, in part, that Evans' complaint was barred by the applicable statute of limitations. Evans filed a memorandum in opposition to Sodexho's motion; and following oral argument, on June 6, 2007, the motion was granted and Evans' complaint was dismissed with prejudice.

¶ 7 Notice of appeal was filed on July 6, 2007; and on July 9, 2007, Evans was ordered to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P.1925(b) within 21 days. Sodexho's motion for attorney's fees, also filed July 6, 2007, was denied on July 9, 2007.[5] Evans filed a timely Rule 1925(b) statement on July 30, 2007; and on August 15, 2007, the trial court filed an opinion. In its Rule 1925(a) opinion, the trial court relies primarily on its June 6, 2007 opinion and order granting summary judgment.

■ ¶ 8 Evans has brought the following issues for this court's review:

A. WHETHER OR NOT THE SUMMARY JUDGMENT DECISION ENTERED BY THE LOWER COURT WAS AGAINST THE WEIGHT OF THE LAW IN EVIDENCE SUBMITTED BY THE PLAINTIFF/APPELLANT IN THE CASE AT BAR.

B. WHETHER OR NOT THE COURT ERRED BY MAKING FACTUAL DETERMINATIONS IN THE CASE AT BAR WHICH WERE MORE PROPERLY RESERVED FOR THE TRIER OF FACT.

C. WHETHER OR NOT THE COURT ERRED BY ACCEPTING THE DEFENDANT/APPELLANT [sic] ARGUMENT THAT THE SEVERANCE PAY PLAN WAS RESTRICTED TO MEMBERS OF THE DEFENDANT/APPELLEE'S EXECUTIVE MANAGEMENT TEAM.

D. WHETHER OR NOT THE COURT ERRED BY TRUSTING THE DEFENDANT/APPELLANT'S [SIC] ARGUMENT THAT THE DEFENDANT/APPELLEE'S EXECUTIVE MANAGEMENT TEAM DID NOT

---

3. Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

4. Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section. 29 U.S.C. § 1132(e)(1).

5. Sodexho did not file a cross-appeal from the denial of its motion for attorney's fees.

INCLUDE THE PLAIN-TIFF/APPELLANT.

E. WHETHER OR NOT THE COURT ERRED BY NOT AC-CEPTING THE PLAINTIFF/AP-PELLANT'S ARGUMENT THAT A TRIER OF FACT, PURSUANT TO THE EVIDENCE SUBMIT-TED, WOULD HAVE DETER-MINED THAT THE PLAIN-TIFF/APPELLANT WAS AT LEAST A *DE FACTO* MEMBER OF THE DEFENDANT/APPEL-LEE'S EXECUTIVE MANAGE-MENT TEAM.

F. WHETHER OR NOT THE COURT ERRED BY NOT PROP-ERLY INTERPRETING THE EXPRESS TERMS OF THE SEV-ERANCE PAY PLAN WHICH INDICATES THAT 'KEY EM-PLOYEES' ARE TO BE AWARD-ED SEVERANCE PAYMENTS.

G. WHETHER OR NOT THE COURT ERRED BY DETERMIN-ING THAT THE STATUTE OF LIMITATIONS BARRED THE PLAINTIFF/APPELLANT'S CLAIMS.

H. WHETHER OR NOT THE COURT ERRED BY NOT AC-CEPTING THE PLAINTIFF/AP-PELLANT'S ARGUMENT THAT THE STATUTE OF LIMI-TAT[I]ONS ISSUE SHOULD HAVE BEEN REVIEWED PUR-SUANT TO THE 'DISCOVERY RULE', DUE TO THE FACT THAT THE PLAINTIFF/APPEL-LANT WAS CONTINUALLY ASKING FOR INFORMATION TO DETERMINE WHETHER OR NOT HE WAS CONSIDERED A KEY EMPLOYEE PURSUANT TO THE TERMS OF THE SEV-ERANCE PLAN.

I. WHETHER OR NOT THE COURT ERRED BY NOT AD-DRESSING THE FACT THAT MARK ADAMS, A NEWLY HIRED MANAGEMENT EM-PLOYEE, WAS GRANTED UAR[ ]'S BY THE DEFEN-DANT/APPELLEE EVEN THOUGH THE PLAINTIFF/AP-PELLANT, A LONG TERM MEM-BER OF THE MANAGEMENT TEAM, WAS DENIED UAR'S.

Evans' brief at 4–5.[6]

¶ 9 Initially, we set forth our standard of review:

> Our standard of review and the general rule for reviewing a lower court's grant or denial of summary judgment is as follows:
>
> > Our review on an appeal from the grant of a motion for summary judgment is well-settled. A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with

---

**6.** We note that Evans' statement of the questions involved violates the mandates of Rule 2116(a) of the Pennsylvania Rules of Appellate Procedure by spanning two pages in direct contravention to the rule, which provides that, "It should not ordinarily exceed 15 lines, must never exceed one page, and must always be on a separate page, without any other matter appearing thereon. This rule is to be considered in the highest degree mandatory, admitting of no exception...." Pa.R.A.P. 2116(a). It is within this court's power to quash an appeal for clear violations of the Rules of Appellate Procedure. *Universal Underwriters Insurance Co. v. A. Richard Kacin, Inc.*, 916 A.2d 686, 689 n. 6 (Pa.Super.2007), citing *Commonwealth v. Stafford*, 749 A.2d 489, 493 (Pa.Super.2000), *appeal denied*, 568 Pa. 660, 795 A.2d 975 (2000). However, because Evans' brief is not so defective as to preclude effective appellate review, we will not quash his appeal. *Id.*

all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Murphy v. Duquesne Univ. of the Holy Ghost,* 565 Pa. 571, 590, 777 A.2d 418, 429 (2001) (Internal Citations and Quotation Marks Omitted).

*Jalapenos, LLC v. GRC General Contractor, Inc.,* 939 A.2d 925, 928 (Pa.Super.2007).

■ ¶ 10 We address Evans' statute of limitations issues first, since if his action at law is barred by the applicable statute of limitations, its relative merits are irrelevant. In issue "G" of Evans' statement of questions involved, he claims that the trial court erred in determining that this action is time-barred. In issue "H," Evans contends that the trial court misapplied the discovery rule for purposes of determining when the statute began to run. We disagree on both counts.

ERISA does not contain a specific statute of limitations for benefits claims, brought under § 502(a)(1)(B), as it does for breach of fiduciary duty claims. *See* 29 U.S.C. § 1113. 'As a general rule, when Congress omits a statute of limitations for a federal cause of action, courts 'borrow' the local time limitation most analogous to the case at hand.' *Gluck v. Unisys Corp.,* 960 F.2d 1168, 1179 (3d Cir.1992). As this court has already decided, 'The state claim most analogous to a claim for denial of benefits due under the terms of a covered plan is a breach of contract claim.' *Caruso v. Life Ins. Co. of North America,* 2000 WL 876581, at *2 (E.D.Pa.2000). The statute of limitations for a breach of contract claim in Pennsylvania is four years. *See* 42 Pa. Cons.Stat. § 5525(8). Federal common law, however, determines when the statute of limitations begins to run for claims under § 502(a)(1)(B). *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125, 1127 (3d Cir. 1988), *overruled on other grounds by Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 187, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997).

*Thomas v. SmithKline Beecham Corp.,* 297 F.Supp.2d 773, 783 (E.D.Pa.2003).

Under the general formulation of the discovery rule, a claim will accrue when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim. The rule that has developed in the more specific ERISA context is that an ERISA non-fiduciary duty claim will accrue after a claim for benefits due under an ERISA plan has been made and formally denied.

*Romero v. Allstate Corp.,* 404 F.3d 212, 222 (3rd Cir.2005) (citations omitted). "Occasionally, however, an ERISA non-fiduciary claim will accrue before a formal

application is made and/or before benefits are formally denied, such as when there has been a repudiation [of the benefits] by the fiduciary which is *clear* and made known to the beneficiar[y]." *Id.* at 222–223 (citations and internal quotation marks omitted) (emphasis in original). "This 'clear repudiation' concept is consistent with the federal discovery rule and, in the specific context of ERISA, avoids a myriad of ills that would accompany any rule that required the denial of a formal application for benefits before a claim accrues." *Id.* at 223 (citations omitted). Indeed, Evans never actually made a formal claim for UAR benefits under the Plan, stating he "was not that bold to address it." (Notes of testimony, 1/13/07 at 55–56.)

¶ 11 The trial court noted that in February 2000, Evans became aware of the Plan while preparing the fiscal 1999 audit. (Trial court opinion, 6/6/07 at 2 n. 1). During his deposition, Evans testified that Wood's accountant at Ernst & Young, Scott Hartman ("Hartman"), asked him why he did not accrue for the phantom stock program. (Notes of testimony, 1/13/07 at 36.) Evans replied that he had no idea what Hartman was talking about. (*Id.*) After speaking with Shipman, Wood's CEO at that time, and Alison Lazerwitz ("Lazerwitz"), Wood's general counsel, Hartman came back to Evans and said, "now I know why you didn't record it, because they didn't want you to know about it." (*Id.*)

¶ 12 The next day, Evans went to Lazerwitz's office and asked her administrative secretary for the corporate minutes. (*Id.* at 36–37.) The secretary told Evans she could not allow him to see the minutes without Lazerwitz's permission. (*Id.*) This was the first time Evans was denied access to the minutes. (*Id.* at 36–37.) Later, after Lazerwitz arrived at work, Evans called her and again requested to see the corporate minutes. (*Id.* at 37.) Lazerwitz refused to permit Evans to look at them unless he specified what particular part he wanted to see. (*Id.*) At that point, as Evans testified, "I knew the gig was up." (*Id.*)

¶ 13 Clearly, Evans was aware as early as February 2000 that the Plan existed and that he was not included, since the board obviously did not even want him to know about it. However, as the trial court determined, by January 2001, at the latest, Evans fully realized he was not a Plan participant. (Trial court opinion, 6/6/07 at 2 n. 1). In December 2000, Evans was working on the impending sale of Wood to Sodexho. (Notes of testimony, 1/13/07 at 38.) A disclosure in the sales agreement stated that three individuals were to receive a $25,000 stay-on bonus following the sale. (*Id.*) Those individuals were Evans, Mark Reed, and Carolyn Kolesar. (*Id.*) Mark Reed was the director of accounting; Carolyn Kolesar was a vice president. (*Id.* at 41.) Evans testified that since the sales agreement listed only those three individuals as receiving stay-on bonuses, and no other key employees were named, he knew they were covered in the phantom stock plan:

Q. Your deduction, if I get you right, because you were named on this stay-on bonus, that you weren't named in anything having to do with the phantom stock plan?

A. Correct.

*Id.* at 41. Evans testified he was "insulted" by the $25,000 stay-on bonus; "they are throwing me a bone." (*Id.* at 38.)

¶ 14 The following month, in January 2001, Mark Adams ("Adams"), Wood's CFO, came to Evans with a piece of paper listing units and participants by number in graph form, and asked Evans to calculate the amounts due. (*Id.* at 38.) Although the participants were only identified by

number and not by name, Evans assumed he was not one of them:

> Q. Did you understand at that point that among those individuals identified by number you were not one of them?
>
> A. Yes.
>
> Q. Did you assume that or know that?
>
> A. I assumed that.
>
> Q. Did you ask anybody about it?
>
> A. No.

*Id.* at 40. Evans felt insulted by Adams' request and gave the paper back to him. (*Id.* at 38.)

■ ¶ 15 We agree with the trial court that at least as of January 2001, Evans knew or should have known that he was not included in the Plan. Although there had been no formal denial, as no formal request had been made, there was a clear and unequivocal repudiation of what Evans considered his right as company controller and a "corporate officer" to participate in the phantom stock plan. Evans did not file suit until February 2006, more than one year after the applicable four-year statute of limitations had expired.

¶ 16 Even if we calculate the statute as beginning to run sometime later in 2001, Evans' claim is still out of time. Evans left Wood in April 2001, at least in part because he was upset about being left out of the Plan. In September 2001, after the sale of Wood to Sodexho, Evans learned from former co-workers that "outrageous sums" had been paid out to certain individuals. (*Id.* at 71–74.) Evans testified it was those conversations that prompted

him to contact his attorney (*id.* at 74); however, suit was not brought until 2006, over four years later.

■ ¶ 17 Evans concedes that the four-year statute of limitations for breach of contract claims in Pennsylvania applies, but argues that the statute should be tolled because, as of December 2003, he was still seeking information pertaining to the Plan. (Evans' brief at 23.) According to Evans, he was still attempting to find out whether or not he was entitled to benefits under the Plan. (*Id.* at 24.)

¶ 18 First, the Plan is not, as Evans repeatedly characterizes it, a "severance" plan. (*Id.* at 22.) Rather, it is a deferred executive compensation plan or "top hat" plan, as discussed in more detail *infra.* Second, we agree with Sodexho that Evans' efforts to learn more details regarding the Plan and why he was considered ineligible do not toll the statute. (Sodexho's brief at 18.) The record clearly demonstrates that in 2001 Evans knew or should have known the alleged injury forming the basis for his claim: that Wood had a phantom stock plan in place, and that Evans was not a participant in it. Indeed, Wood's failure to include Evans in the Plan contributed to his decision to leave the company after nearly 20 years. For whatever reason, Evans did not initiate this lawsuit until February 2006, five years later. Therefore, it is absolutely barred by the statute of limitations and we find no error in granting Sodexho's motion for summary judgment.[7]

7. We note that the trial court, in a comprehensive and erudite opinion, found Evans' claim most analogous to a claim under Pennsylvania's Wage Payment and Collection Law, 43 P.S. § 260.9a. The WPCL's statute of limitations is three years, measured from the date that unpaid wages were due and payable. 43 P.S. § 260.9a(g). While we find Evans' claim

more analogous to a breach of contract claim, it does not change the outcome since the statute of limitations for breach of contract in Pennsylvania is four years. In addition, this court may affirm on any valid basis. *Plasticert, Inc. v. Westfield Ins. Co.,* 923 A.2d 489, 492 (Pa.Super.2007) (citation omitted).

¶ 19 In addition to finding Evans' complaint time-barred, the trial court went on to determine that the claim is substantively defective. We agree and will briefly review Evans' remaining issues. We choose to address them together rather than set them out *seriatim*, since they can all be reduced to the same basic contention: that Evans was a "key management employee" entitled to participate in the Plan.

 ¶ 20 As stated *supra*, the Plan in this case is an executive deferred compensation plan, commonly called a "top hat" plan.[8] While top hat plans are subject to ERISA, they are not subject to all of ERISA's stringent requirements and regulations. *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 286 (3rd Cir.1995), *cert. denied*, 517 U.S. 1209, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996).

> Top hat plans, however, which benefit only highly compensated executives, and largely exist as devices to defer taxes, do not require such scrutiny and are exempted from much of ERISA's regulatory scheme. *See Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 930 n. 7 (3d Cir.1985). In particular, top hat plans are not subject to certain vesting, participation, and fiduciary requirements. *Id.* at 930–31. But despite the exemption of top hat plans from many of ERISA's regulations, ERISA's enforcement provision clearly permits participants in top hat plans, as well as other covered plans, to bring civil actions 'to enforce the substantive provisions of the Act or to recover benefits due or otherwise enforce the terms of the plan.' *Id.* at 935; *see* 29 U.S.C. § 1132(a)(1)(B) ('A civil action may be brought by a partici-pant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.').

*Kemmerer, supra* at 286–287 (footnote omitted). *See also Goldstein v. Johnson & Johnson*, 251 F.3d 433, 436 (3rd Cir. 2001) ("this Court has routinely treated top hat plans differently from other kinds of plans.") (citation omitted). Whereas most ERISA plans are analogous to "trusts" for employees, with the plan administrator serving as trustee, top hat plans are more appropriately considered as unilateral contracts, and are governed by ordinary contract principles. *Id.* at 435–436; *Kemmerer, supra* at 287 ("breach of contract principles, applied as a matter of federal common law, govern disputes arising out of the plan documents").

¶ 21 The preamble to the Plan states:

> The Wood Company wishes to further the growth, development and financial success of the Company, to attract key management employees to the Company, to induce key management employees to remain with the Company, and to align the interests of such employees with the interests of the owners of the Company. In furtherance thereof, The Wood Company 1999 Phantom Unit Appreciation Rights Plan is designed to provide incentives based on the value of the Company to members of the Company's executive management team, and other key management employees whose positions are likely to have a significant impact upon the profitability and success

---

8. "A top hat plan is a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees." *Abbott v. Schnader, Harrison, Segal & Lewis, LLP*, 805 A.2d 547, 558 n. 13 (Pa.Super.2002), quoting *In re New Valley Corp.*, 89 F.3d 143, 148 (3rd Cir.1996) (internal quotation marks omitted).

of the Company, in the form of Phantom Unit Appreciation Rights.

¶ 22 With regard to administration of the Plan, it provides, in relevant part:

The Plan shall be administered by the Board, or a committee, the members of which shall be appointed by the Board (the Board or such committee are hereinafter referred to for these purposes as the 'Administrator').

"1999 Phantom Unit Appreciation Rights Plan" ¶ 2(a).

Subject to the provisions of the Plan, the Administrator shall have full discretion and exclusive power (i) to authorize the granting of Phantom UARs to eligible employees of the Company; (ii) to determine, with the advice of the Chief Executive Officer of the Company, the eligibility of an employee to receive Phantom UARs and to determine which eligible employees will receive Phantom UARs. . . .

*Id.* ¶ 2(b).

In the event of any dispute or disagreement as to the interpretation of the Plan or of any rule, regulation or procedure, or as to any question, right or obligation arising from or related to the Plan, the decision of the Administrator shall be final and binding upon all persons.

*Id.*

¶ 23 Under the heading "Eligibility," the Plan provides:

The individuals who shall be eligible to receive Phantom UARs under the Plan shall be employees of the Company who are members of the executive management team of the Company and such other classes of key management employees as determined in writing annually by the Administrator.

*Id.* ¶ 3.

¶ 24 As the trial court found, it is undisputed that Evans was not a member of the EMT and that neither Evans, nor anybody else for that matter, was ever determined to be a "key management employee" in writing by the Administrator for purposes of the Plan. Therefore, Evans was ineligible for participation in the Plan.

¶ 25 In his deposition, Evans stated that there were 12 members of the EMT, the composition of which was well known within the company. (Notes of testimony, 1/13/07 at 29.)[9] Evans admitted he was not on the EMT. (*Id.* at 30.) Although Evans described himself as a "key employee," he conceded he was not aware of any determination in writing, by the Administrator, designating any other classes of key management employees as being eligible for the Plan. (*Id.* at 52.) Evans was never asked to sign the Plan agreement. (*Id.* at 52–53.) Evans agreed that without a determination in writing by the Administrator, under the plain terms of the Plan, he would not be eligible to participate:

Q. What do you know or believe that entitles you to your participation in the plan?

A. A key employee.

Q. Are you suggesting that—is that language of the plan that we quoted earlier, do you believe you are among such other classes of key management employees as determined in writing annually by the administrator?

9. The members of the EMT were Anita Bowers, Jim Mecuri, Bill Gardano, Virginia French, Robert Wood, Alison Lazerwitz, Jean Scott, Damon Liever, Mark Toomey, Steve Rostow, Mark Shipman, and Mark Adams. (Notes of testimony, 1/13/07 at 26–29; 2/27/07 at 19–20.) The members of the EMT were heads of various departments throughout the company, *e.g.,* human resources, sales, and marketing. (Notes of testimony, 2/27/07 at 19–21.)

A. Yes.

Q. Would you agree that if there has been no determination of any members of such classes in writing, you wouldn't have the ability to be a participant?

MR. THOMPSON: I will object to form. You can answer that if you can.

A. Repeat the question.

Q. Would you agree with me that if there has been no writing, no written determination by the administrator to add participants from such other classes of key management that you wouldn't have a right to participate?

MR. THOMPSON: Object to form. You can answer.

A. Yes.

*Id.* at 56–57.

¶ 26 As this is an appeal from the grant of summary judgment for the defendant, it is important to repeat that, as stated above, it is absolutely uncontested that Evans was not a member of the EMT and that he was never designated, in writing by the plan Administrator, as a "key management employee" eligible for participation in the Plan. Shipman, Wood's CEO who first presented the Plan to the board, testified that Evans was not a member of the EMT and that he never had any intention of putting Evans on the EMT:

Q. Did you ever desire or think about putting Mr. Evans on the EMT?

A. No.

Q. Why not?

A. Primarily because it was just department of operations head[s] which were on the executive management team and Jack Evans was not one of those.

Notes of testimony, 2/27/07 at 23. Shipman also testified that neither he nor the board ever recommended anybody not on the EMT be included in the Plan, and the Administrator never made any such designation. (*Id.* at 22–23.)

¶ 27 Evans argues that even if he were not technically a member of the EMT, fairness dictates that he be recognized as a "de facto" member of the EMT. We cannot credit Evans' argument. The EMT was clearly defined and its members known throughout the company. Simply put, Evans was not a member of the EMT, "de facto" or otherwise.

¶ 28 In a similar vein, Evans argues that he was a "key employee" of Wood and, therefore, eligible to participate in the Plan. Certainly, as a long-term employee and controller of the company, Evans was a "key employee" in the everyday sense of the phrase. Shipman, Wood's CEO, conceded as much. (Notes of testimony, 2/27/07 at 23–24.) However, for purposes of the Plan, Evans was not a "key management employee" designated as such, in writing, by the Plan Administrator with the consent and approval of the board of directors. On this point, there is no debate.

¶ 29 In issue "I" of his statement of questions involved, Evans claims the trial court erred in not addressing the fact that Adams, the new CFO of Wood, was granted UAR's while Evans was not. (Evans' brief at 26.) Evans complains that this was a "slap in the face" and unfair. (*Id.*) Again, Evans completely misses the mark. Adams, although a new hire at the time, was Wood's Chief Financial Officer and, therefore, a member of the EMT and eligible for participation in the Plan. As CFO, Adams was effectively Evans' boss. (Notes of testimony, 2/27/07 at 23.)

¶ 30 It is plain from Evans' deposition testimony that this lawsuit boils down to the simple fact that Evans, with 19 years of service and having risen from office

manager to controller of the company, was offended that he was excluded from participation in the phantom stock plan. It is worth noting that Mark Reed, director of accounting, and Carolyn Kolesar, a vice president of health care, were also excluded and, presumably, performed "key functions" for Wood as well. In addition, as Evans was manifestly not a participant in the Plan, and he cannot, and does not, argue that the board did not have the right to limit participation in the Plan to a clearly defined group of key management employees, it is doubtful whether Evans even had standing to bring this action in the first place. We have uncovered no other instance where an employee brought an ERISA claim against a benefits plan to which said employee did not even belong.

■ ¶ 31 Finally, we address Evans' claim that the trial court used the wrong standard of review. Evans argues that the trial court used an arbitrary and capricious standard when a heightened standard should have applied. (Evans' brief at 13–14.)

> Courts must review an ERISA administrator's actions *de novo* 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' in which case review is under the arbitrary and capricious standard. The key, then, lies in determining whether a plan provides an administrator with such discretion.

*Winchester v. Prudential Life Insurance Co. of America*, 975 F.2d 1479, 1483 (10th Cir.1992) (citations omitted). Instantly, as described above, the Plan gave the Administrator discretionary authority to determine which "key management employees" were eligible for UAR's. Hence, the appropriate standard for judicial review was whether the Administrator's actions were arbitrary and capricious. The case upon which Evans relies for his assertion that a "heightened standard" should have applied, *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377 (3rd Cir.2000), is readily distinguishable because there, an insurance company both determined eligibility for benefits and paid those benefits out of its own funds. The court held that where an insurance company pays benefits out of its own coffers, a heightened degree of scrutiny applies to the decision to deny benefits because of the financial conflict. *Id.* at 379. Obviously, that is not this case, where we are reviewing the Administrator's actions pursuant to an unfunded, executive deferred compensation plan. The trial court did not apply the incorrect standard of review, and there is no evidence of bad faith or arbitrary and capricious conduct.

¶ 32 Having determined that Evans' claim is barred by the applicable statute of limitations, and that it is without any support in the record and Evans failed to state a claim as a matter of law, we will affirm the order granting Sodexho's summary judgment motion.

¶ 33 Order affirmed.