Opinion
issued December 29, 2011   

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 
 


 

 

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 


 
 

 
 



NO. 01-10-00946-CV

 


 
 

 
 



OFFSHORE RECRUITING SERVICES, INC.,
Appellant

 

V.

 

NEW HAMPSHIRE INSURANCE COMPANY, LLOYD’S OF LONDON
SYNDICATE # 724, LLOYD’S OF LONDON SYNDICATE # 2724, LLOYD’S OF LONDON
SYNDICATE # 1183, LLOYD’S OF LONDON SYNDICATE # 2183, LONDON AND EDINBURGH
INSURANCE COMPANY LTD., AND AXA GLOBAL RISKS (UK) LTD., Appellees

 


 
 

 
 
 



On Appeal from the 269th District Court

Harris County, Texas

Trial Court Cause No. 2008-75676

 


 
 

 
 
 



MEMORANDUM
OPINION

Appellant, Offshore Recruiting
Services, Inc. (“Offshore”), challenges the trial court’s rendition of summary judgment
in favor of appellees, New Hampshire Insurance Company, Lloyds’s of London
Syndicate # 724, Lloyds’s of London Syndicate # 2724, Lloyds’s of London
Syndicate # 1183, Lloyds’s of London Syndicate # 2183, London and Edinburgh
Insurance Company Ltd., and AXA Global Risks (UK) Ltd. (collectively, “the London
Insurers”), in Offshore’s suit against the London
Insurers for breach of contract, violations of the Texas Insurance Code,
violations of the Texas Deceptive Trade Practices Act,[1]
civil conspiracy, and fraud.  In seven
issues, Offshore contends that the trial court erred in granting the London
Insurer’s summary judgment motion on all of its causes of action.    

We affirm.    

Background

          Petrodrill Engineering N/V, Inc. (“Petrodrill”),
which managed the construction and commissioning of six offshore oil drilling units,
entered into an agreement with Offshore for Offshore to provide Petrodrill with personnel for a Petrodrill-managed
semi-submersible drilling vessel construction project (the “Personnel
Agreement”).  The Personnel Agreement
required Offshore to maintain with Lombard Canada Limited (“Lombard”) an “Employers
Liability Insurance” policy (the “Lombard Policy”), and it required Offshore
and Petrodrill to “indemnify, defend, and hold the
other harmless from and against any and all claims, losses, costs, damages and
expenses . . . in respect of injury to . . . or death of any person employed by
itself or its other contractors or subcontractors . . . arising out of or in
connection with” the Personnel Agreement.

          During
the construction project, an accident occurred in which one Offshore
worker was killed and two Offshore workers were injured.   The injured workers and the estate of the
deceased worker sued Petrodrill, and it requested
that Offshore, pursuant to the indemnity provision in the Personnel Agreement,
defend it against the workers’ claims.  Offshore
refused, and Petrodrill, after it later settled the workers’
claims for $912,000, sued Offshore in a Maine court for indemnification for the
settlement amounts and its legal expenses.[2]   Offshore challenged the jurisdiction of the
Maine court, contending that Petrodrill’s claim was
subject to arbitration, and Petrodill submitted its indemnification
claim to arbitration in England.   

In the arbitration, Offshore disputed
that the indemnity provision applied and it had “employed” the injured and
deceased workers within the meaning of the Personnel Agreement’s indemnity
provision.  However, the arbitrator disagreed
and issued a detailed award order, concluding that Petrodrill
was entitled to indemnification for the settlement amounts pursuant to the
indemnity provision in the Personnel Agreement. 
  

Within the award order, the
arbitrator also addressed an application to amend that Offshore had filed
during the arbitration proceedings.  The
arbitrator noted that Offshore had asserted in its application that it was
entitled to insurance coverage under a “general maritime and construction
liability insurance policy” issued by the London Insurers to Petrodrill. The London Policy identified Petrodrill as the “Principal Assured” and described
“Additional Insureds” and “Other Assureds.”  Offshore contended that it qualified as a
“co-assured” under the London Policy and the London Insurers had waived their
subrogation rights against it.  The
arbitrator did not directly address the merits of Offshore’s
arguments.  Instead, the arbitrator concluded
that Offshore’s application to amend was made “too
late,” Offshore could have sought application of the London Policy earlier in
the arbitration proceedings, there was “no evidence that [the London Policy]
would have been refused,” and the “lateness” of Offshore’s
application could not be “justified” on the basis of discovery complaints made
by Offshore. Thus, the arbitrator denied Offshore’s
application to amend.  

After the entry of the arbitration
award, Offshore sent to the London Insurers a letter, demanding that they
defend and indemnify it against the claims made by Petrodrill
in the arbitration on the basis that Offshore was an “additional
insured” under the London Policy. 
Subsequently, Offshore filed, against the London Insurers, the instant suit,
alleging that they had breached the London Policy by bringing, through Petrodrill, the arbitration proceeding against it for
indemnification of the settlement amounts.  In support of its breach-of-contract action,
Offshore alleged that it qualified as an “Assured” or “Other Assured” under the
London Policy.  It also alleged that the
London Insurers breached the London Policy by not defending and indemnifying it
against Petrodrill’s claim and instituting the “subrogation
action” (i.e., the arbitration proceeding) against Offshore in violation of the
waiver-of-subrogation-rights provision in the London Policy.  In support of its civil-conspiracy claim,
Offshore alleged that the London Insurers had conspired to deny it assured
status.  In support of its Texas Insurance
Code and fraud claims, Offshore alleged that the London Insurers had breached
their prompt-pay duties, engaged in unfair settlement practices, misrepresented
the terms of the London Policy, and violated their duty to disclose or not
fraudulently conceal certain information. 
Offshore asserted that the arbitrator had not “adjudicated” its
“defenses” in the arbitration proceeding, and, at the end of its petition, noted
that Lombard, its insurer, had “paid the arbitration award and damages” and was
the real party in interest.  

The London Insurers moved for summary
judgment, arguing that the Personnel Agreement required Offshore to procure
employer’s liability insurance, the London Policy was “excess to any other
insurance in existence with respect to [Offshore’s]
liability under the Personnel Agreement,” Lombard fully indemnified Offshore
for the arbitration award so there was “no excess judgment” to which the London
Policy could be applied, the London Policy did “not respond” to Offshore’s claims, and Offshore “lack[ed]
standing” because the London Policy provided that “Other Assureds” could only
exercise their rights “with the privity of and
through the Principal Assured [Petrodrill]” and Petrodrill was “in no way involved” in Offshore’s
claim.  The London Insurers also argued
that because Lombard fully indemnified Offshore, there were no longer any
claims to which Lombard could subrogate. 
And they argued that Offshore’s “derivative
claims” failed because the London Policy did not cover Offshore and they did
not owe Offshore any duty to inform it of the existence of the London
Policy.  

In the summary-judgment proceedings,
the parties focused almost exclusively on the relevant language of the
Personnel Agreement, which is set forth above, and the relevant policy provisions
of the London Policy, which are set forth below.  The London Policy, which identified the
“Principal Assured” as Petrodrill, provided that,
with regard to “third party liabilities,” the London Insurers would “indemnify
the Assured for all sums . . . imposed upon the Assured by law” or “assumed
under contract or agreement” for “damages on account of” personal
injuries.  It further described “Other
Assureds” as follows:

[2.]    OTHER
ASSUREDS

 

(3)     Any other
company, firm, person or party (including but not limited to contractors and/or
sub-contractors and/or suppliers) with whom the Assured(s) . . . have entered
into written contract(s) in connection with the subject matters of this
Insurance, and/or any works activities, preparations connected therewith.

 

The interests of the “Other Assured(s)” shall be
covered throughout the entire Policy Period (irrespective of contract
period(s)) subject to full coverage as herein, unless specific contract(s) contain provisions to the contrary, in
which event, insurance hereunder for such specific contract(s) only, shall be
limited accordingly.

 

The foregoing shall not operate to increase the
Limit(s) of Liability contained herein or to prevent a claim settlement to any
Principal Assureds otherwise recoverable but for this paragraph.

 

The rights of “Other Assureds” under this Policy may
only be exercised with the privity of and through the Principal Assured hereon.[3]

 

(Emphasis added.)  In a section detailing the policy period, the
London Policy provided, 

The interest of “Other Assured(s)” shall be covered
throughout the entire Policy Period (irrespective of contract period(s) subject
to full coverage as herein, unless specific contract(s) contain provisions to
the contrary, in which event, Insurance hereunder for such specific contract(s)
only, shall at the Principal Assured’s option be limited accordingly. In accordance with the above this Insurance
shall be deemed to have benefit of and only respond for amounts not recovered
from or payable by other insurance required by contract of “Other Assured(s)”
as defined in Article 2.(3). The foregoing shall not operate to Increase
the Limit(s) of Liability contained herein.

 

(Emphasis added.)  In a section entitled “Subrogation,” the
policy provided, 

Underwriters agree to waive rights of subrogation
against any Assured and any person, company or corporation whose interests are covered by this Policy and against any Employee,
agent or contractor of the Principal Assureds or any Individual, (including
visitors) agent, firm, affiliate or corporation for whom the Principal Assureds
may be acting or with whom the Principal Assureds may have agreed prior to any
loss to waive subrogation, . . . .

 

(Emphasis added).  Finally, in a section entitled “Other
Insurance,” the policy provided,

Furthermore with regard to liability coverage under
this [section] to “Other Assureds” it is understood and agreed that where separate Policy(ies)
may be in existence in respect of “Other Assureds” as defined in Article 2. (3)
the amount of cover required by contract shall be
deemed to be underlying.  

 

(Emphasis added.)  The trial court granted the London Insurers’
summary judgment motion, dismissing all of Offshore’s
claims.

 

Standard of Review

To prevail on a summary-judgment
motion, a movant has the burden of proving that it is entitled to judgment as a
matter of law and there is no genuine issue of material fact.  Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d 339, 341 (Tex. 1995).
 When a defendant moves for summary
judgment, it must either (1) disprove at least one essential element of the
plaintiff’s cause of action or (2) plead and conclusively establish each
essential element of its affirmative defense, thereby defeating the plaintiff’s
cause of action.  Cathey, 900 S.W.2d at 341; Yazdchi v. Bank One,
Tex., N.A., 177 S.W.3d 399, 404 (Tex. App.—Houston [1st Dist.] 2005, pet.
denied).  When deciding whether
there is a disputed, material fact issue precluding summary judgment, evidence
favorable to the non-movant will be taken as true.  Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548–49
(Tex. 1985). Every reasonable inference must be indulged in
favor of the non-movant and any doubts must be resolved in its favor.  Id. at 549.

Breach of Contract

In its first five issues, Offshore
argues that the trial court erred in granting the London Insurers summary
judgment on its breach-of-contract claim because it qualified as an “Other
Assured” under the London Policy, the London Policy was ambiguous and the trial
court was required to accept its “reasonable interpretation,” the London
Insurers “presented no facts to support a reasonable meaning of the language”
of the London Policy, and the London Insurers breached the London Policy by
failing to indemnify Offshore against the arbitration claim and by violating
the “waiver of subrogation” provision. 
Offshore also argues that the trial court erred to the extent that it
granted summary judgment on the ground of res judicata because the London
Insurers raised this argument for the first time in their summary-judgment
reply and res judicata does not apply to bar its claims.  Offshore further argues that the trial court
erred to the extent that it granted summary judgment on the ground that the
London Policy was “excess” to the Lombard Policy because the London Insurers
failed to provide any evidence of the terms of the Lombard Policy, there were
“material fact issues” as to whether the London Policy provided excess
coverage, and the London Policy and the Lombard Policy “covered different
risks, rendering the ‘other insurance’ clause [in the London Policy]
inapplicable.”  Finally, Offshore argues
that the trial court erred to the extent that it granted summary judgment on
the ground that Lombard had already paid the arbitration claim and there was no
remaining claim to which Lombard, the real party in interest, could subrogate.

The London Insurers assert that Offshore
lacked standing under the London Policy, the Lombard Policy was “underlying”
the London Policy, and Offshore’s claims are barred
because Lombard already fully indemnified it.

We interpret an insurance policy
according to general rules of contract construction to ascertain the parties’
intent. Gilbert Tex.
Const., L.P. v. Underwriters at Lloyd’s London, 327 S.W.3d 118, 126 (Tex. 2010);
Don’s Bldg. Supply, Inc. v. OneBeacon
Ins. Co., 267 S.W.3d 20, 23 (Tex. 2008).  We first look to the language of the policy
because we presume that parties intend what the words of their contract say. Gilbert Tex. Const., L.P., 327 S.W.3d at 126.  We
examine the entire policy and seek to harmonize and give effect to all
provisions so that none will be meaningless.  Id.  We give the policy’s terms their ordinary and
generally-accepted meaning unless the policy shows that the terms were used for
a technical or different sense.  Id. 
Where the language is plain and unambiguous, we must enforce the policy
as made by the parties, and we “cannot make a new contract for them, nor change
that which they have made under the guise of construction.”  Fiess v. State Farm Lloyds, 202 S.W.3d 744,
753 (Tex. 2006).  

Whether a contract is ambiguous is
itself a question of law. Am.
Mfrs. Mut. Ins. Co. v. Schaefer,
124 S.W.3d 154, 157 (Tex. 2003).  An ambiguity does not arise simply because
the parties offer conflicting interpretations. Gilbert Tex. Const., L.P., 327 S.W.3d at 133.  Rather, an ambiguity exists only if the policy
language is susceptible to two or more reasonable interpretations.  Am. Mfrs. Mut. Ins. Co., 124 S.W.3d at 157.  If the policy language is
susceptible to more than one reasonable interpretation, the interpretation that
most favors coverage will be adopted.  Gilbert
Tex. Const., L.P., 327 S.W.3d at 133.  

Assuming that Offshore may qualify as
an “Other Assured” under the London Policy,[4] the
London Policy contains three separate provisions plainly indicating that
coverage for an other assured is limited in the event
that the other assured was contractually required to obtain other applicable coverage.  The first limiting provision in the London
Policy is the “Other Assureds” provision, which expressly provides that other assureds
are entitled to coverage “unless specific contract(s) contain” contrary
provisions. The provision provides that, in such an event, insurance available
under the London Policy will be “limited accordingly.”  The second limiting provision is the “Period”
provision, which provides that other assureds are entitled to coverage “unless
specific contract(s) contain” contrary provisions.  The provision provides that, in such an
event, insurance under the London Policy “shall” be “limited accordingly,” and at
the “Principal Assured’s option.”  The Period
provision goes even further, expressly providing that “[i]n
accordance with the above,” insurance under the London Policy “shall . . . only
respond for amounts not recovered from or payable by other insurance” policies
that are “required by contract of ‘Other
Assureds,’” as that term is defined in the London Policy.  (Emphasis added.)  The third limiting provision is the “Other
Insurance” provision, which provides that when a separate policy exists “in
respect of Other Assureds,” as that term is defined in article 2.3, the “amount
of cover[age] required by contract
shall be deemed to be underlying.” (Emphasis added.)   In addition to these three limiting
provisions, the London Policy specifically states that “Other Assureds” may
exercise their rights under the London Policy only with “the privity of and through the Principal Assured,” Petrodrill. 

Here, it is undisputed that the
Personnel Agreement, which contained an indemnity provision, required Offshore
to maintain $5 million in insurance coverage under the Lombard Policy.  In the prior arbitration proceeding, the
arbitrator concluded that the workers who were injured and killed were
employees of Offshore and the Personnel Agreement’s indemnity provision
required Offshore to indemnify Petrodrill for the
amounts that it paid to settle the workers’ claims.  Offshore did not attempt to challenge these arbitration
findings, nor could it in the instant proceeding.  It is also undisputed that Offshore’s insurer, Lombard, fully indemnified Offshore for
the settlement amounts that the arbitrator ordered it to pay pursuant to the Personnel
Agreement’s indemnity provision.  

We conclude, based upon the
unambiguous language of the London Policy, that Offshore
was not entitled to seek indemnification as an “Other Assured” from the London
Insurers for the amounts its insurer, Lombard, paid pursuant to Personnel
Agreement’s indemnity provision and in compliance with the arbitrator’s
order.  The only reasonable
interpretation of the London Policy is that, assuming that Offshore could
qualify as an other assured,
any coverage for Offshore was potentially available only for any amount in
excess of any applicable insurance that Offshore was contractually obligated to
obtain.  The London Policy provided that,
under the circumstances presented, the coverage under the Lombard Policy was
“underlying” and the London Policy would only “respond” to amounts not covered
by Offshore’s Policy. 
The Lombard Policy was applicable because, as Offshore admits, Lombard
paid the amounts that it sought to recover in the instant proceeding.

This interpretation is supported by
the London Policy’s provision that an other
assured could exercise its rights with the “privity
of” and “through” Petrodrill.  Petrodrill asserts
that this language should be interpreted to mean that Offshore may not seek
policy benefits without Petrodrill’s agreement. Offshore counters that this language simply refers to the parties’
original contractual agreement, i.e., the Personnel Agreement, and that the
necessary privity exists.  Petrodrill’s
interpretation is consistent with the three limiting provisions of the London
Policy.  Offshore’s
interpretation ignores the fact that we are required to read the London Policy
as a whole and that we should read provisions in context with the entire
policy.  See Gilbert Tex. Const., L.P.,
327 S.W.3d at 133 (noting that court should interpret policy exclusion “in
context” with other policy terms). 
Moreover, in almost every conceivable instance, Offshore’s
interpretation would render this language a nullity.  We are to interpret the policy in a manner
that harmonizes and gives effect to all provisions so that none are
meaningless.  Id.

Offshore argues that we cannot
interpret the London Policy as excess or the Lombard Policy as “underlying”
because the Lombard Policy covers different risks than the London Policy and
Texas case law provides that, when policies cover different risks, “Other
Insurance” provisions are inapplicable.  First,
Offshore’s argument ignores the undisputed fact that
Lombard has already paid the amounts that Offshore now seeks to recover.  Second, even if the undisputed fact of payment
was not controlling, Offshore’s argument on the
effect of the “Other Insurance” provision and its discussion of the general applicability
of Other Insurance clauses[5] does
not address the specific language of the London Policy and the “Other Insurance”
provision in this case.  As we have noted
above, the London Policy contains, in three separate instances, limiting provisions
that make clear that, in the event an “Other Assured” is contractually
obligated to obtain insurance, any applicable insurance applies first and effects
coverage available under the London Policy. 
Third, the “Other Insurance” provision in this case makes express reference
to the amount of coverage for policies existing as “required by contract,” and
it states that these amounts “shall be deemed to be underlying.”  This provision is unambiguously referring to
the Lombard Policy obtained by Offshore that has paid the claims at issue.  In sum, when reading the entire London
Policy, the only reasonable interpretation is that the Lombard Policy that
Offshore was contractually obligated to obtain, and that had already paid the
claim, applies first, and the London Policy, if it even applies under these
circumstances, is excess.  As the London
Policy states, the Lombard Policy is underlying.    

In regard to Offshore’s
argument that the London Insurers breached the waiver-of-subrogation provision
in the London Policy, Offshore has not cited any authority to support its
attempt to subsequently bring a wholly separate breach-of-contract lawsuit
against the London Insurers for their alleged breach of this provision on the
basis that Offshore qualifies as an other
assured.  Discussion of this issue in
Texas case law suggests that a waiver-of-subrogation provision is commonly
recognized as supporting an affirmative defense in a subrogation action. See Travelers
Lloyds Ins. Co. v. Dyna Ten Corp., No.
2-08-502-CV, 2009 WL 2619232, at *1 (Tex. App.—Fort Worth Aug. 26, 2009, no
pet.) (mem. op.) (referring
to affirmative defense supported by subrogation waiver); Lloyd’s of London v. Buddy Miller Enters., Inc., No. 2-00-200-CV,
2001 WL 34041177, at *6 (Tex. App.—Fort Worth July 19, 2001, no pet.) (reversing summary judgment granted in favor of defendant on
“waiver of subrogation affirmative defense); see also Crow-Williams, I v.
Fed. Pacific Elec. Co., 683 S.W.2d 523, 525 (Tex. App.—Dallas 1984, no
writ) (affirming summary judgment in favor of defendant on basis
waiver-of-subrogation provision); Lee R. Russ & Thomas F. Segalla, 16 Couch on
Insurance § 224:5 (2000) (stating that “antisubrogation
rule is an affirmative defense”).  That the
waiver of subrogation provision in this case supports an affirmative defense is
illustrated by the fact that Offshore itself attempted to raise this provision
as an affirmative defense in the arbitration, even though the arbitrator ultimately
determined that it was “too late” and the “lateness” could not be
“justified.”  We conclude that Offshore
could have raised the waiver-of-subrogation argument as an affirmative defense
in the arbitration, but it does not provide a basis for Offshore to bring a
separate claim for affirmative relief in this subsequently filed proceeding.

Moreover, Offshore’s
attempt to bring a wholly separate cause of action for breach of contract on
the basis of the waiver-of-subrogation provision, subsequent to a legal
proceeding in which it has already, unsuccessfully attempted to raise this
matter as an affirmative defense, would defeat the general purpose of these
types of provisions.  Waiver-of-subrogation
provisions are intended to “eliminate the need for lawsuits” and “avoid[] disruption and disputes among the parties.”  Walker Eng’g, Inc. v. Bracebridge Corp.,
102 S.W.3d 837, 841 (Tex. App.—Dallas 2003, pet. denied) (citation omitted).  Permitting Lombard, through its insured
Offshore, to pursue yet another lawsuit arising from the injuries and death of
the Offshore employees, after this matter was raised
in the arbitration and ultimately rejected for “lateness,” would simply
continue the history of litigation between these parties. 

Here, the Personnel Agreement
required Offshore to maintain the Lombard Policy.  After the arbitrator concluded that the
indemnity provision in the Personnel Agreement required Offshore to indemnify Petrodrill for the settlement amounts paid to the injured
and deceased Offshore workers, the Lombard Policy,
which was “underlying” the London Policy, paid these amounts.  In these circumstances, although the
waiver-of-subrogation provision could have been asserted as an affirmative
defense in a subrogation action, it does not support the filing of a subsequent
lawsuit by Offshore against the London Insurers for a separate breach-of-contract
claim.   

We conclude that the London Insurers
established as a matter of law that they did not breach the London Policy by
failing to indemnify Offshore for the amounts that the arbitrator ordered Offshore
to pay Petrodrill pursuant to the indemnity provision
in the Personnel Agreement.  We further
conclude that the London Insurers established as a matter of law that they did
not breach the London Policy and violate the subrogation provision by bringing
the arbitration to enforce the indemnity provision in the Personnel Agreement.  Accordingly, we hold that the trial court did
not err in granting summary judgment on Offshore’s
breach-of-contract claim.

We overrule Offshore’s
first five issues.

Other Claims

In its sixth and seventh issues,
Offshore argues that the trial court erred in granting summary judgment on its remaining
claims for violations of the Texas Insurance Code, deceptive trade practices,
conspiracy, and fraud because “the basis for the dismissal stems from the
erroneous conclusion that Offshore was not entitled to pursue it breach of
contract claim.”  Offshore further argues
that the trial court erred in granting summary judgment because the London
Insurers “were under a duty pursuant to the disclosure rules in the arbitration
proceeding to produce a copy of the [London] Policy and failed to comply with
that duty.”

Offshore’s claims for violations of the Insurance
Code and deceptive trade practices, as pleaded, are contingent upon the
allegations giving rise to Offshore’s breach-of-contract
claim.  Thus, our prior
conclusion that the London Insurers established as a matter of law that they
did not breach the London Policy resolves all of these claims. 

The only additional matter that is
not resolved by our prior holding is Offshore’s
allegation, made in support of its fraud and conspiracy claim, that the London
Insurers committed fraud as a result of failing to timely produce the London
Policy in the arbitration proceedings in England.  To the extent that Offshore has alleged that
the London Insurers had a duty to disclose to Offshore its potential status as an other assured under the London Policy, the Texas Supreme
Court has held that an insurer with knowledge that a suit implicating policy
coverage has been filed against its additional insured does not have a duty to
inform the additional insured of the available coverage.  Nat’l Union Fire Ins. Co. of Pittsburgh, PA v. Crocker, 246 S.W.3d
603, 606 (Tex. 2008).  And, to the
extent that Offshore is seeking to pursue a cause of action against the London
Insurers for failing to timely produce the London Policy in the arbitration
proceeding, there is no authority that would permit Offshore to pursue
affirmative relief for this discovery violation in the instant proceeding.  

Accordingly, we hold that the trial
court did not err in granting summary judgment on Offshore’s
remaining claims for violations of the Texas Insurance Code, deceptive trade
practices, conspiracy, and fraud.

We overrule Offshore’s
sixth and seventh issues.  

 

 

 

 

 

Conclusion

          We
affirm the judgment of the trial court.            

                             

 

Terry Jennings

Justice

 

Panel consists of Justices Jennings, Bland,
and Massengale.











[1]           See
Tex. Bus. & Com.
Code Ann. §§ 17.41–.63 (Vernon 2011).





[2]           In its petition in the instant action,
Offshore alleged that the London Insurers paid the settlement funds and, thus,
the claim filed against it by Petrodrill in Maine,
along with the subsequent arbitration, constituted a subrogation action brought
by the London Insurers against Offshore. 
The arbitration award order refers to Petrodrill
as the claimant. 





[3]           In
addition to designation of “Other Assureds,” the London Policy provided that
“any individual firm or corporation . . . for whom or with whom the Assured may
be operating is  . . . an Additional
Assured when required by contract.”  Offshore does not contend that it qualifies as
an Additional Assured.





[4]           The London Insurers did not challenge,
for summary-judgment purposes, that Offshore could be considered an other assured in certain
circumstances.  Rather, they contended
that, under the circumstances presented, Offshore was not entitled to any
coverage under the London Policy.  





[5]           See, e.g., Hartford Cas. Ins. Co. v. Executive Risk Specialty Ins.
Co., No. 05-03-00546-CV, 2004 WL 2404382, at *2 (Tex. App.—Dallas Oct. 28, 2004,
pet. denied) (mem. op.) (discussing
“Other Insurance” provisions).